COMMONWEALTH OF MASSACHU-
SETTS, et al., Plaintiffs, Appellees,

v.

SECRETARY OF HEALTH AND HU-
MAN SERVICES, Defendant,
Appellant.

No. 88–1279.

United States Court of Appeals,
First Circuit.

March 19, 1990.

Alfred Mollin, Appellate Staff, Civ. Div., Dept. of Justice, with whom Stuart E. Schiffer, Acting Asst. Atty. Gen., Washington, D.C., Wayne A. Budd, U.S. Atty., Boston, Mass., D. Mass., Joel Mangel, Deputy Chief Counsel, Public Health Service, Rockville, Md., Carol Conrad, Atty., Office of the Gen. Counsel, Dept. of Health and Human Services and John F. Cordes, Appellate Staff, Civ. Div., Dept. of Justice, Washington, D.C., were on brief, for defendant, appellant.

James M. Shannon, Atty. Gen., Boston, Mass., for the Com. of Mass., with whom Ruth A. Bourquin, Asst. Atty. Gen., Boston, Mass., David Cole of the Center for Constitutional Rights, Wendy Warring and Hill & Barlow, Boston, Mass., for intervenor Mary Moe, were on brief, for plaintiffs, appellees.

James L. Feldesman, with whom Susan D. Lauscher and Feldesman, Tucker, Leifer, Fidel & Bank, Washington, D.C., for Nat. Family Planning and Reproductive Health Ass'n and American Public Health Ass'n, were on brief, for plaintiffs, appellees.

Before CAMPBELL, Chief Judge, BOWNES, BREYER, TORRUELLA and SELYA, Circuit Judges.

## OPINION EN BANC

BOWNES, Circuit Judge.

The Secretary of Health and Human Services (HHS) appealed from an injunction issued by the district court of Massachusetts enjoining enforcement of regulations promulgated under Title X of the Public Health Services Act, 42 U.S.C. § 300 *et seq.* The regulations significantly alter HHS's interpretation of section 1008 of Title X, which provides that "[n]one of the funds

appropriated under [Title X] shall be used in programs where abortion is a method of family planning." 42 U.S.C. § 300a–6. Prior to the promulgation of the new regulations, the Secretary construed section 1008 to prohibit the use of Title X funds to encourage or promote abortion but to permit nondirective counseling to pregnant women on all available medical and legal options, including abortion. The new regulations prohibit any counseling or referral for abortion services and redefine the scope of Title X projects to restrict privately funded abortion-related activities. The district court found that the new regulations represented an abrupt reversal of a long-standing agency policy, and concluded that each of the various provisions either exceeded the statutory authority of the Secretary or infringed upon constitutionally protected activities. The court therefore enjoined the enforcement or application of the regulations.

A panel of this court heard argument on July 28, 1988 and affirmed the opinion of the district court with one judge dissenting in part. That opinion was withdrawn and an *en banc* hearing was held to consider the effect of the Supreme Court's decision in *Webster v. Reproductive Health Services*, —— U.S. ——, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989), which was issued after the panel opinion. In *Webster*, a sharply divided Court upheld portions of a Missouri law that prohibited state funds or facilities from being used for abortions. The Court found that the Missouri law "places no governmental obstacle in the path of a woman who chooses to terminate her pregnancy." 109 S.Ct. at 3052 (quoting *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980)). The Court relied upon and reaffirmed the holdings of *McRae* and *Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977) and upheld the validity of *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) and the right of reproductive choice. Thus *Webster* did not change the legal landscape upon which the panel opinion was based. We hold that although, with one exception, the regulations are permissible under the enabling statute, they are unconstitutional.

## I. STATUTORY AND REGULATORY BACKGROUND

### A. *The Title X Program*

The Family Planning and Services Population Research Act of 1970, which added Title X to the Public Health Service Act, authorizes the Secretary of Health and Human Services

> to make grants to and enter into contracts with public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services....

42 U.S.C. § 300(a). Title X grantees operate health care facilities offering a wide range of family planning information and services, including contraceptive prescriptions and counseling on all choices that follow pregnancy, and referrals to other medical service providers.

The majority of Title X grantees are public health clinics. Many of these clinics provide abortion facilities on the same site as the Title X project, sharing many of the same staff and resources but relying on nonfederal funds for the abortion-related activities. Under the prior policy many of the Title X grantees provided women with abortion counseling and referrals. This longstanding agency policy was embodied in the Program Guidelines issued by HHS in 1981 which required that pregnant women be provided with "nondirective" counseling and referrals on alternative courses of action, such as prenatal care and delivery, infant care, foster care, adoption and abortion. *See* Program Guidelines for Project Grants for Family Planning Services (1981), *reprinted in* Joint Appendix (J.A.) at 71, 85.

No family planning project can be completely funded by Title X. 42 C.F.R. § 59.11(c). Projects that receive funds under Title X are required to provide nonfederal "matching funds" of at least 10% of the money provided through Title X. 42 U.S.C. § 300a–4. In fact, "matching funds" comprise a much larger portion of

the budget than the required 10%. *See, e.g.,* J.A. at 40–41, 55, 61–62. *See also Valley Family Planning v. North Dakota,* 661 F.2d 99, 100 (8th Cir.1981) (Title X funds 33% of budget). This money is provided through state payments such as Medicaid, fees paid by the clients (based on a sliding scale) and private funds. At oral argument, the Secretary stated that federal government funds account for about 50% of the money received by Title X clinics.

Title X projects serve an estimated 14.5 million women. About a third of those who receive services are adolescents and approximately ninety percent of the women served had incomes below 150 percent of the poverty line. 131 Cong.Rec. S16860 (daily ed. Dec. 4, 1985). *See also* J.A. 40–41, 55, 61–62, 213. One of the most frequent reasons for an initial visit to a Title X family planning facility, particularly by adolescents, is for a pregnancy test. Program Guidelines for Project Grants and Family Planning Services, Public Health Service, 1981, J.A. at 71, 84.

B. *The New Regulations*

On February 2, 1988, the Secretary promulgated the superseding regulations that are at issue in this case. The relevant provisions are set forth in Appendix A. These regulations significantly alter the previous agency interpretation of Title X by prohibiting nondirective abortion counseling or referral and by enlarging the degree of financial and physical separation required between federally and nonfederally funded activities conducted by a Title X grantee.

The new regulations change many aspects of the existing regulations. Our focus will be on a few particular changes. First, some key definitions have been changed. In Section 59.2 the term "family planning" is redefined to refer solely to "preconceptional" services. The result, if the regulations are implemented, would render Title X funds no longer available for pregnancy or post-partum services. "Title X program" and "Title X project" are also redefined to include not only grant funds but also "grant-related income or matching funds." 42 C.F.R. § 59.2. By virtue of this change, the extensive prohibitions against counseling, referral and abortion-related activities in the regulations apply broadly to recipient generated income as well as to federal funds.

As mentioned, the regulations reverse the preexisting policy of nondirective counseling. 42 C.F.R. § 59.8. Specifically, they prohibit counseling or referral for abortion as a method of family planning and require that all Title X clients diagnosed as pregnant receive "a list of available providers that promote the welfare of mother and unborn child" as well as information "necessary to protect the health of the mother and unborn child." 42 C.F.R. § 59.8(a). In an emergency, a Title X entity may refer a client to a provider of "emergency medical services." *Id.* The regulations also specifically prohibit a Title X entity from circumventing the abortion prohibitions by using the list of referrals "as an indirect means of encouraging or promoting abortion as a method of family planning." 42 C.F.R. § 59.8(a)(3). Finally, although a Title X entity may provide information that is medically necessary to assess the relative risks and benefits of various contraceptive methods, that information may not include the counseling or promotion of abortion. 42 C.F.R. § 59.8(a)(4).

The new regulations also require that Title X entities be "physically and financially separate" from entities providing proscribed activities or information. 42 C.F.R. § 59.9. The Title X entities must have "an objective integrity and independence" that reaches beyond separate bookkeeping to include separation of accounting records, facilities and personnel and even separate signs for the federally and nonfederally funded activities. *Id.*

Finally, the regulations contain a list of prohibited activities including lobbying for pro-choice legislation, providing speakers to promote the availability of abortion, paying dues to groups that advocate abortion and engaging in legal action or developing and disseminating materials to promote abortion as an option in the case of an unintended pregnancy. 42 C.F.R. § 59.10.

## II. PROCEEDINGS BELOW

Appellees, the Commonwealth of Massachusetts, the National Family Planning and Reproductive Health Association (NFPRHA) and the American Public Health Association filed suit for declaratory and injunctive relief in federal district court on February 2, 1988. The district court allowed the intervention of Mary Moe, a low-income woman dependent upon a Title X entity for her health care needs.

In their joint complaint, appellees charged that the new regulations reversed a consistent and longstanding agency interpretation of Title X without any justification, and violated both congressional intent and the constitutional rights of Title X grantees and their clients. Appellees filed a motion for preliminary injunction on February 9, 1988, alleging that implementation of the regulations would undermine seriously the quality and character of the Title X program. The Secretary opposed the motion for a preliminary injunction and moved that the action be dismissed, or, in the alternative, that summary judgment be granted.

The district court held a hearing on February 18, 1988, and issued a final decree on March 3, 1988, consolidating the preliminary injunction with a decision on the merits. In its opinion, the court addressed both the statutory and the constitutional issues. *Massachusetts v. Bowen*, 679 F.Supp. 137 (D.Mass.1988). The court considered the various sections of the new regulations independently and found that the prohibition on abortion counseling and referral exacted a penalty for the exercise of protected speech. It also found that the prohibition constituted a content-based restriction unsupported by a compelling government interest. The court therefore enjoined the enforcement of section 59.8 on first amendment grounds.

The court then considered the restrictions on lobbying and advocacy. It found that section 59.10 had a more far-reaching

effect than a mere refusal to subsidize. In light of the restriction on the use of non-federal funds and the requirement of complete financial and physical separation contained in sections 59.2 and 59.9, the court held that the Secretary had imposed an unduly burdensome requirement on Title X grantees that was not narrowly tailored to meet the legitimate goal of not subsidizing advocacy. The court further found that section 59.10 constituted a content-based restriction that violated the first amendment and enjoined the enforcement of that provision. In addition, the court enjoined the enforcement of section 59.9, finding that the physical and financial separation requirement violated the congressional intent to create coordinated family planning services. And finally, the court concluded that the restriction imposed by the new regulations on the flow of neutral information concerning abortion to pregnant women violated the right to privacy as established in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

## III. STATUTORY ANALYSIS

Because courts should only decide unavoidable constitutional questions, we begin our analysis with an inquiry into whether the new regulations exceed the Secretary's authority under Title X. *See, e.g., Harris v. McRae*, 448 U.S. 297, 307, 100 S.Ct. 2671, 2683, 65 L.Ed.2d 784 (1980) (quoting *Spector Motor Service v. McLaughlin*, 323 U.S. 101, 105, 65 S.Ct. 152, 154, 89 L.Ed. 101 (1944)); *Benoni v. Boston and Maine Corp.*, 828 F.2d 52, 57 (1st Cir.1987).[1] The Secretary is empowered by the statute to promulgate regulations to ensure that the grants are made in accordance with the statute. 42 U.S.C. § 300a–3. The Secretary, of course, must issue regulations that implement the intention of Congress. Thus the interpretive question posed is

> whether Congress [has] directly spoken on the precise question at issue. If the

---

**1.** The Secretary, in supporting his construction of the statute as manifest in the regulations, seemingly urges us to consider the constitutional questions. He argues that if there are consti-

tutional issues here "there is no construction of the regulations by which [they] can be avoided." Appellant's Reply Brief at 15.

intent of Congress is clear, that is the end of the matter; for the court as well as the agency, must give effect to the unambiguously expressed intent of Congress. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). Four factors should be considered in attempting to ascertain congressional intent: (1) the language of the statute; (2) the contemporaneous legislative history; (3) any subsequent legislative history and (4) agency interpretation(s) of the statute. *Consumer Product Safety Comm. v. GTE Sylvania,* 447 U.S. 102, 108–20, 100 S.Ct. 2051, 2056–62, 64 L.Ed.2d 766 (1980). If an examination of these factors does not reveal the legislative intent, then deference to the agency interpretation of the statute is appropriate *if* the agency interpretation "is based on a permissible construction of the statute." *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782. Of course, less deference is due to an agency's position that is inconsistent with a prior consistently held agency view. *I.N.S. v. Cardoza–Fonseca,* 480 U.S. 421, 107 S.Ct. 1207, 1221 n. 30, 94 L.Ed.2d 434 (1987). With these guidelines in place, we turn to the statute.

### 1. Statutory Language

We start with the language of section 1008 of Title X: "None of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning." 42 U.S.C. § 300a–6. Both appellees and the Secretary contend that the "plain meaning" of this sentence requires the result they seek.

Appellees argue that the ordinary meaning of the words in the statute prohibits only the funding of abortions and does not reach the funding of abortion counseling or referral. Appellees also contend that section 1008's prohibition applies to programs funded by Title X and may not be extended to prohibit abortion activities funded privately by a recipient organization.

The Secretary disputes that reading and argues that the new regulations are consistent with the language of the statute.

He contends that the new regulations more closely follow the prohibition of section 1008 by recognizing the importance of counseling and referral to family planning and by prohibiting any abortion-related activity in those areas and limiting the services of the clinics to only preconceptional services. The Secretary further argues that the prohibition on abortion stated in section 1008 limits the statutory language favoring integration and coordination of family planning services and that the program separation requirements of the new regulations are therefore consistent with the statute.

The statutory language is inconclusive. The prohibition in section 1008 is phrased broadly and is susceptible of many differing interpretations. *Accord* Memorandum from Joel M. Mangel, Deputy Assistant General Counsel, Division of Public Health Grants and Services, to Louis H. Hellman, M.D., Deputy Assistant Secretary for Population Affairs (Apr. 20, 1971), *reprinted in* J.A. at 108. It is not enough for appellees to show that the statutory language does not expressly forbid counseling and referral or mandate complete physical and financial separation. The Secretary's construction does not contravene the express language of the statute itself. We must therefore look beyond the exact wording of section 1008 to attempt to assess the meaning of the statute. *Accord Planned Parenthood Fed'n of America v. Bowen,* 680 F.Supp. 1465, 1468 (D.Colo.1988); *New York v. Bowen,* 690 F.Supp. 1261 (S.D.N. Y.), *aff'd,* 863 F.2d 46 (2d Cir.1989).

### 2. Legislative History

Appellees argue that Congress intended to provide a full range of information to Title X clinic clients and to coordinate *all* family planning services. The Secretary argues that Congress intended to fund only *preventive* family planning and that the new regulations are therefore more consistent with the legislative intent than the previous agency mandate for nondirective counseling.

The legislative history is inconclusive in most respects. The statement of purpose

in the House Report preceding the passage of Title X stressed the importance of supplying both family planning services and a full range of family planning information and of developing a comprehensive and coordinated program. H.Rep. No. 1472, 91st Cong., 2d Sess. (1970), *reprinted in* 1970 U.S.Code Cong. & Admin.News 5068. The Conference Report stated that funding would be used only to support preventive family planning, with the caveat that Title X programs should be fully coordinated with state and local programs which by implication included programs that counselled or provided abortions. H.R.Conf. Rep. No. 1667, 91st Cong., 2d Sess. (1970), *reprinted in* 1970 U.S.Code Cong. & Admin.News 5080, 5081. There is language in the legislative history that can be read as allowing non-grant money to be used for abortion related activity:

> The conferences have adopted the language contained in section 1008, which prohibits the use of such funds for abortion. The legislation does not and is not intended to interfere with or limit programs conducted in accordance with State or local laws and regulations which are supported by funds other than those authorized under this legislation.

*Id.* at 5082.

The Secretary attempts to bolster his legislative history argument by relying on a few comments by Congressman Dingell made during the House debate. Such comments are accorded little weight when compared with other tools of statutory interpretation. *Consumer Product,* 447 U.S. at 118, 100 S.Ct. at 2061; *Chrysler Corp. v. Brown,* 441 U.S. 281, 311, 99 S.Ct. 1705, 1722, 60 L.Ed.2d 208 (1979). In addition, these comments are neither persuasive nor unambiguous.[2] Thus the legislative intent about the scope of the abortion prohibition is unclear.

█ There was clearly expressed legislative intent to expand the level of family planning services provided to low-income women and to coordinate family planning services. The district court ably surveyed this evidence:

> The legislative history of Title X offers persuasive evidence that the program integrity regulations run contrary to congressional intent underlying section 1008. The original Conference Report on Title X stated that the abortion prohibition was "not intended to interfere with or limit programs" supported with other than Title X funds. H.R.Conf.Rep. No. 1667, 81st Cong., 2d Sess. (1970), *reprinted in* 1970 U.S.Code Cong. & Admin.News 5082. Furthermore, the Report of the Senate Labor and Public Welfare Committee for the 1975 reauthorization of Title X provided:
>
>> The Committee encourages the use of funds otherwise authorized by this bill for the provision of family planning services, not only in specialty clinics, but, where such facilities do not exist or are impractical, in entities devoted to comprehensive health care for low-income families.... [I]t is essential that there be close coordination and, whenever possible, integration of family planning services into all general health care programs.
>
> S.Rep. No. 63, 94th Cong., 1st Sess. 65–66 (1975), *reprinted in* 1975 U.S.Code Cong. & Admin.News 528.
>
> The contemporaneous and continuous agency interpretation was consistent with this view. Indeed, the statute itself mandates "a State plan for a coordinated and comprehensive program of family planning services." 42 U.S.C. § 300a(a) (1982). The requirement of physical separation runs contrary to this congressional emphasis on coordinated and integrated health care services.

*Massachusetts v. Bowen,* 679 F.Supp. at 143. Appellees submitted numerous affidavits stating that the new regulations would require many clinics either to give up their Title X funding or to terminate family planning services altogether. *See, e.g.,* Affidavit of Leslie Tarr Laurie, Execu-

---

**2.** The Secretary attached to his brief comments received in response to the proposed regulations from Representative Dingell, in which Dingell claims that the Secretary misunderstands his statements in the congressional debate.

**60**

tive Director of Family Planning Council of Western Massachusetts, *reprinted in* J.A. at 40, 41; Affidavit of Diane M. Booth, Executive Director of Planned Parenthood of Central Missouri, *reprinted in* J.A. at 55, 57; Affidavit of Karen Cody Carlson, Executive Director of Planned Parenthood of Greater Kansas City, *reprinted in* Joint Appendix at 61, 63; *and* Affidavit of Mary Russell, Director of Family Planning for Action for Boston Community Development, *reprinted in* J.A. at 213, 215. We agree with the district court that the requirement of physical and financial separation set forth in section 59.9 violates congressional intent because of the effect it would have of limiting family planning programs. That result would be completely contrary to the express Congressional intention to expand family planning services. We affirm the district court's conclusion that the promulgation of section 59.9 exceeds the Secretary's authority and we enjoin its enforcement.

### 3. Subsequent Legislative History

■ The contemporaneous legislative history does not directly address the issues of abortion counseling and referral or lobbying and advocacy, so we turn to subsequent legislative history for guidance. We are aware of the longstanding principle that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *Consumer Product Safety Comm'n,* 447 U.S. at 117–19, 100 S.Ct. at 2060–62 (footnote omitted) (*citing United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 348–49, 83 S.Ct. 1715, 1733–34, 10 L.Ed.2d 915 (1963) which quotes *United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 331, 4 L.Ed.2d 334 (1960)). We also recognize that subsequent legislative *history* provides an even shakier ground than subsequent legislative *action* from which to infer original intent. *Id.* 447 U.S. at 118 n. 13, 100 S.Ct. at 2061 n. 13. Nonetheless, subsequent Congressional inaction may signal acquiescence to an agency interpretation. *Haig v. Agee,* 453

U.S. 280, 300–01, 101 S.Ct. 2766, 2778–79, 69 L.Ed.2d 640 (citing *Zemel v. Rusk,* 381 U.S. 1, 11–12, 85 S.Ct. 1271, 1278–79, 14 L.Ed.2d 179 (1965)) (the amendment of one statute, considered in light of the failure to amend another related statute, under which the Secretary of State had asserted broad powers, may indicate congressional acquiescence to the administrative construction of the unmodified statute). *Accord North Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 534–35, 102 S.Ct. 1912, 1924–25, 72 L.Ed.2d 299 (1982).

■ Congressional inaction in the face of agency action on a subject of heated national interest and debate also merits additional consideration and weight. *Bob Jones Univ. v. United States,* 461 U.S. 574, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983). In *Bob Jones Univ.,* the Internal Revenue Service changed a longstanding policy and issued a new ruling that denied tax-exempt status to private schools practicing racial discrimination. The Court upheld the agency ruling, stating:

> [F]ew issues have been the subject of more vigorous and widespread debate and discussion in and out of Congress than those related to racial segregation in education. Sincere adherents advocating contrary views have ventilated the subject for well over three decades. Failure of Congress to modify the IRS rulings of 1970 and 1971, of which Congress was, by its own studies and by public discourse, constantly reminded, and Congress' awareness of the denial of tax-exempt status for racially discriminatory schools when enacting other and related legislation make out an unusually strong case of legislative acquiescence in and ratification by implication of the 1970 and 1971 rulings.

*Id.* at 599, 103 S.Ct. at 2032.

Appellees analogize this case to *Bob Jones Univ.* They contend that the failure of Congress to amend section 1008, despite repeated amendments, reauthorizations and reenactments of Title X,[3] indicates acqui-

---

**3.** Title X has been reauthorized six times. *See Brief of Amici Curiae Rep. Patricia Schroeder et al.* 17 n. 16 (collecting citations).

escence to the agency's preexisting policy of allowing nondirective counseling as provided for in the 1981 Program Guidelines. Appellees argue that this congressional inaction merits additional weight, under the principle of *Bob Jones Univ.*, because of the volatility and importance of the national controversy over abortion rights.[4]

■ The Secretary disagrees on two grounds. First, he argues that the subsequent legislative history of Title X reflects confusion over the scope of the abortion prohibition and therefore Congress cannot be deemed to have ratified an agency construction that it did not wholly understand. Second, he argues that, even if we could infer ratification of the previous agency interpretation, such ratification would merely reflect acquiescence to a prior policy—it would not indicate that the Secretary's new policy exceeds his statutory authority.

The Secretary's second argument is persuasive. Although appellees have stated a strong case for congressional acquiescence, the ratification of one agency policy by Congress does not preclude a change in that policy. In *Bob Jones Univ.*, congressional acquiescence in agency policy was used as proof that an agency was acting within its statutory authority. Here appellees would use congressional acquiescence to prior agency policy as proof that a change in that policy is beyond the scope of its statutory mandate. The Court rejected similar reasoning in *Motor Vehicle Mfrs. Assoc. v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). In that case, the Court reviewed a decision of the Secretary of Transportation to rescind a requirement that automobiles be equipped with passive restraints and held that previous congressional support for the passive restraint requirement did not preclude a change in policy:

> While an agency's interpretation of a statute may be confirmed or ratified by subsequent congressional failure to

change that interpretation ... in the cases before us, even an unequivocal ratification—short of statutory incorporation—of the passive restraint standard would not connote approval or disapproval of an agency's later decision to rescind the regulation.

*Id.* at 45, 103 S.Ct. at 2867 (citing *Bob Jones Univ.*, 461 U.S. at 599–602, 103 S.Ct. at 2032–34; and *Haig*, 453 U.S. at 291–300, 101 S.Ct. at 2773–78). Similarly, in the present case, congressional support for a narrow reading of the abortion prohibition does not necessarily indicate that the new regulations violate congressional intent.

### 4. Contemporaneous Agency Policy

■ An agency's contemporaneous construction of its founding statute should be given deference. Moreover, a contemporaneous construction "deserves special deference when it has remained consistent over a long period of time." *EEOC v. Associated Dry Goods Corp.*, 449 U.S. 590, 600 n. 17, 101 S.Ct. 817, 823 n. 17, 66 L.Ed.2d 762 (1981) (citations omitted). *Accord Andrus v. Shell Oil Co.*, 446 U.S. 657, 667–68, 100 S.Ct. 1932, 1938–39, 64 L.Ed.2d 593 (1980). Such deference is necessary because a contemporaneous construction is more likely to reflect the intent of the enacting Congress. *See St. Luke's Hosp. v. Secretary of Health and Human Servs.*, 810 F.2d 325, 331 (1st Cir.1987).

Appellees argue that the agency's contemporaneous and consistent interpretation of section 1008 to permit nondirective counseling and to encourage coordination with local and state family planning services is entitled to substantial deference. The Secretary construes the contemporaneous policy of HHS differently. He argues that the thrust of prior policy was a prohibition on any encouragement or promotion of abortion; the new regulations remain true to that policy and merely readjust the level at

---

**4.** The Colorado federal district court found this argument persuasive in its analysis of the new Title X regulations. *See Planned Parenthood Federation of America v. Bowen*, 680 F.Supp. 1465, 1472 (D.Colo.1988) ("Congressional refus-

al on repeated occasions to change its policy permitting the neutral dissemination of information about abortion represents ratification of said policy.").

which prohibited encouragement is deemed to commence.

The Secretary's position is untenable. We agree with both the court below and the district court in Colorado that the new regulations constitute a radical break from a prior consistent policy permitting nondirective counseling: "[F]rom the time Congress enacted § 1008 in 1970, [the Secretary] consistently interpreted it to permit the neutral dissemination of information about abortion, and the referral upon request to entities which provide abortion." *Planned Parenthood Fed'n of America,* 680 F.Supp. at 1471.

There are three independent interpretations of section 1008 that support our conclusion. First, a 1971 memorandum from the office of General Counsel to the Deputy Assistant Secretary for Population Affairs states that, although section 1008 should be read broadly to prohibit any encouragement or promotion of abortion, it should not be read so broadly as to impede the coordination of family planning activities. *See* Memorandum from Joel M. Mangel, *reprinted in* J.A. at 110. Second, a report from the office of the General Counsel to the Senior Attorney, Public Health Division, states:

> This office has traditionally taken the view that § 1008 not only prohibits the provision by Title X grantees of abortion as a method of family planning by the Title X-supported program. Under this view, *the provision of information concerning abortion services, mere referral of an individual to another provider of services for an abortion,* and the collection of statistical data and information regarding abortion *are not considered to be proscribed by § 1008.* The provision of "pregnancy counselling" in the sense of encouraging persons to obtain abortions and the provision of transportation to persons to enable them to obtain abortions, on the other hand, are considered to be proscribed by § 1008.

Memorandum from Elsie Sullivan, Assistant for Information and Education, Office of Family Planning, to Senior Attorney, Public Health Division (Apr. 1, 1978), *re-* *printed in* J.A. at 113, 114–15 (footnotes omitted) (emphasis added). And finally, the 1981 Program Guidelines issued by HHS specifically require nondirective counseling for pregnant women:

> Pregnant women should be offered information and counseling regarding their pregnancies. Those requesting information on options for the management of an unintended pregnancy are to be given non-directive counseling on the following alternative courses of action, and referral upon request:
> * Prenatal care and delivery
> * Infant care, foster care, or adoption
> * Pregnancy termination

Program Guidelines for Project Grants for Family Planning Services, *reprinted in* J.A. at 85. The record, therefore, reflects a consistent agency interpretation that permitted nondirective counseling, encouraged coordination of all family planning services and prohibited only active encouragement or promotion of abortion.

Such a contemporaneous agency construction is compelling but we cannot conclude on the basis of this evidence alone that the congressional intent is unambiguous. Congress has not addressed specifically the question of the scope of the abortion prohibition. The language of the statute and the legislative history can support either of the litigants' positions. Therefore, we must determine whether the new regulations are a *permissible* construction of Title X. *See Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82.

5. Deference to the Agency Construction

■ The district court found that the Secretary had failed to justify the change in policy embodied in the new regulations. In its opinion, the court held the regulations to a heightened standard of review: "[W]hen an agency decides to change the course of a longstanding administrative interpretation, it must justify its action to a greater degree than when it first promulgates regulations." 679 F.Supp. at 141–42 (citing *Motor Vehicle Mfrs. Ass'n,* 463 U.S.

at 41–42, 103 S.Ct. at 2865–66). We find heightened scrutiny unwarranted.

When an agency rescinds or modifies a policy, its actions are subject to the same standard of review as that applied to the original promulgation of a policy: the arbitrary and capricious standard. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 41, 103 S.Ct. at 2865. Such review, although narrow, is still broader than that accorded to a refusal to promulgate rules in the first instance:

> [T]he revocation of an extant regulation is substantially different than a failure to act. Revocation constitutes a reversal of the agency's former views as to the proper course.... Accordingly, an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance.

*Id.* at 41–42, 103 S.Ct. at 2865–66. The heightened standard referenced by the district court is adjudged in comparison to a refusal to act, not in comparison to a previous promulgation of rules. *Cf. Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) (agency refusal to take enforcement action presumptively unreviewable). The standard of review applicable to both original agency action and agency rescission or modification of a prior standard requires the agency action to be "rational, based on consideration of the relevant factors, and within the scope of the

authority delegated to the agency by the statute." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 42, 103 S.Ct. at 2866. Applying this standard to the case at bar, we must decide whether the Secretary has provided a "reasoned analysis" for the change in agency policy.

The Secretary advances two bases for the new regulations. *See* 53 Fed.Reg. 2922 *et seq.* (Feb. 2, 1988), *reprinted in* J.A. at 169. First, he argues that the new regulations more closely conform to the language of section 1008. *See* 53 Fed.Reg. at 2923. We have already found that the statutory language is ambiguous and susceptible to differing interpretations so that the argument is unpersuasive. Second, the Secretary argues that, even if not mandated by the express language of section 1008, the new regulations more "faithfully and effectively" implement the abortion prohibition. 53 Fed.Reg. at 2923. The Secretary cites reports by the Office of the Inspector General (OIG) and the General Accounting Office (GAO) to support his assertion that Title X projects required guidance "to preserve the distinction between Title X programs and abortion as a method of family planning." *Id.*

The reports provide a very slim reed of support. Both reports found that Title X grantees were aware of and acted in accordance with the prohibition against the encouragement or promotion of abortion.[5] The two reports did suggest, however, that

---

**5.** The GAO summarized the agency's construction of that prohibition as follows:

> Based on HHS' legal opinions, the following types of activities related to abortions are allowable under title X programs. Recipients *may:*
> —provide information about abortion services;
> —provide the name, address, and telephone number of abortion providers;
> —collect statistical data and information regarding abortion;
> —inspect facilities to determine their suitability to provide abortion services; and
> —pay dues to organizations that advocate the availability of abortion services.
> Recipients *may not*
> —provide counseling that encourages a person to obtain an abortion,

> —provide transportation to an abortion center or provider,
> —provide proabortion speakers to debate the issues in public forums,
> —advocate the need and suitability of abortion service in the community,
> —produce or show movies that tend to encourage or promote a favorable attitude toward abortion,
> —provide abortion as a suitable backup method of family planning,
> —make specific appointments or referrals for an abortion unless medical conditions warrant,
> —bring legal action to liberalize abortion-related statutes, and
> —pressure local governing bodies to change restrictive abortion policies.
>
> Report by the Comptroller General (Sept. 24, 1982), *reprinted in* J.A. at 125, 144–45.

the Secretary clarify the agency's preexisting policy position on abortion-related activities. The GAO report further suggested that, given the sensitivity of the abortion controversy, the agency might look to Congress for any further guidance on the scope of the abortion prohibition. The OIG and the GAO reports only called for a clarification of existing standards. The Secretary construes the reports more broadly and argues that the suggestion of clarification provides support for the promulgation of wholly new and modified regulations.

Were we to apply a heightened standard of review, we well might find the Secretary's rationale lacking; however, our scope of review is narrow. We must " 'uphold a decision of less than ideal clarity if the agency's path may be reasonably discerned.' " *Motor Vehicles Mfrs. Ass'n*, 463 U.S. at 43, 103 S.Ct. at 2866 (quoting *Bowman Transp. v. Arkansas–Best Freight Sys.*, 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974)). We may not apply a heightened scrutiny to the actions of the Secretary in order to avoid the more difficult constitutional issues raised by the abortion controversy.[6] Although these facts present a very close case, we cannot say that the Secretary has failed utterly to provide a reasoned basis for change. We must defer to the agency construction of the statute.

### 6. Conclusion

■ Our examination of the traditional elements of statutory construction yields the following results. The plain words of the statute are susceptible to differing interpretations. The contemporaneous legislative history is inconclusive, except on the issue of program coordination. The subsequent legislative history indicates congressional acquiescence to the previous agency policy promoting nondirective counseling, but this acquiescence does not preclude a change in agency policy. And finally, because of the deference due an agency's interpretation of an enabling statute, the Secretary's new policy is not impermissible under the statute. We turn therefore to the constitutional questions presented by the new regulations.

### IV. THE RIGHT OF REPRODUCTIVE CHOICE

Appellees argue that even if the counseling and referral regulations do not violate Title X, they are an unconstitutional encroachment upon a woman's right to reproductive choice because they impermissibly restrict the information a Title X client receives during pregnancy counseling and by impermissibly restricting the contours of the physician-patient relationship in a Title X project. *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). The Secretary attempts to refute that contention with the bald assertion that the regulations merely implement a funding decision to support childbirth over abortion and that the regulations impose no obstacle whatsoever to a woman's choice between those alternatives. *Webster v. Reproductive Health Services*, — U.S. —, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989); *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980); *Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484. We find the Secretary's reliance on *Webster*, *Maher* and *McRae* misplaced.

We note first that the HHS regulations implicate more significant rights than those at issue in *Webster* and that the regulations create exactly the type of obstacle about which the *Webster* Court was concerned. *Webster* did not involve a first amendment issue and, as the Court explicitly noted, the Missouri statute only concerned funding of abortions and not the conduct of physicians. 109 S.Ct. at 3053. For these reasons, *Webster* does not dictate a reversal as the Secretary urges.

---

6. *Cf. Roe v. Wade*, 410 U.S. at 116, 93 S.Ct. at 708 ("We ... acknowledge ... the sensitivity and emotional nature of the abortion controversy, of the vigorous opposing views, even among physicians, and of the deep and seemingly absolute convictions that the subject inspires.... Our task, ... is to resolve the issue by constitutional measurement, free of emotion and of predilection.")

▪ Because the new regulations do pose a significant obstacle to a Title X client's decision to terminate her pregnancy by curtailing her ability to receive counseling on abortion from the physician responsible for her medical care. We therefore find them unconstitutional.

▪ Our analysis starts with the uncontested proposition that the Constitution protects a woman's independence in making "certain kinds of important decisions." *Whalen v. Roe,* 429 U.S. 589, 599–600, 97 S.Ct. 869, 876–77, 51 L.Ed.2d 64 (1977) (footnote omitted). *See also Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). That protection extends to decisions concerning both childbirth and the termination of a pregnancy. *See Roe v. Wade; City of Akron v. Akron Center for Reproductive Health,* 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983); *Thornburgh v. American College of Obstetricians and Gynecologists,* 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779

To ensure independence in a woman's decisionmaking, the Supreme Court has rejected attempts to intrude into the dialogue between a woman and her physician. *See, e.g., Akron,* 462 U.S. at 442–47, 103 S.Ct. at 2499–2502; *Thornburgh,* 476 U.S. at 763–65, 106 S.Ct. at 2180–81. In *Akron* and *Thornburgh,* the Court invalidated informed consent provisions designed to influence a woman's choice between childbirth and abortions, reaffirming a woman's right "in consultation with her physician, to decide to have an abortion and to effectuate that decision 'free of interference by the state.'" *Akron,* 462 U.S. at 429–30, 103 S.Ct. at 2492–93 (quoting *Roe v. Wade,* 410 U.S. at 163, 93 S.Ct. at 731) (footnote omitted). *See also Thornburgh,* 476 U.S. at 761–64, 106 S.Ct. at 2179–81.

In *Akron,* the Court struck down a city ordinance that required, *inter alia,* a woman's physician to make specified statements to the patient prior to performing an abortion in order to ensure that the woman's consent was "truly informed." *Id.* at 423, 103 S.Ct. at 2488. The ordinance was unconstitutional for two "equally decisive" reasons. *Id.* at 445, 103 S.Ct. at 2500. First, the ordinance required that "dubious facts" be provided in order to manipulate a woman's choice between childbirth and abortion. As the Court stated, "It is fair to say that much of the information required is designed not to inform the woman's consent but rather to persuade her to withhold it altogether." *Id.* at 444, 103 S.Ct. at 2500. Second, the Court found that, by requiring a physician to provide specified information to a client, the ordinance placed a physician in an "'undesired and uncomfortable straightjacket.'" *Id.* at 445, 103 S.Ct. at 2500 (quoting *Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 67 n. 8, 96 S.Ct. 2831, 2840 n. 8, 49 L.Ed.2d 788 (1976)). The Court stressed the role of the doctor in the woman's decision stating that "it remains primarily the responsibility of the physician to ensure that appropriate information. is conveyed to his patient, depending on her particular circumstances." *Id.* 462 U.S. at 443, 103 S.Ct. at 2499. The Court concluded:

> By insisting upon recitation of a lengthy and inflexible list of information, Akron unreasonably has placed 'obstacles in the path of the doctor upon whom [the woman is] entitled to rely for advice in connection with her decision.'

*Id.* at 445, 103 S.Ct. at 2500 (quoting *Whalen v. Roe,* 429 U.S. at 604 n. 33, 97 S.Ct. at 879 n. 33) (footnote omitted).

Both of *Akron*'s "equally decisive" reasons were used by the Court in striking down the informed consent provision at issue in *Thornburgh.* The Court warned that, although informed consent provisions were not unconstitutional as a general rule, "the State may not require the delivery of information designed 'to influence the woman's informed choice between abortion or childbirth.'" *Thornburgh,* 476 U.S. at 760, 106 S.Ct. at 2178 (quoting *Akron,* 462 U.S. at 443–44, 103 S.Ct. at 2499–2500). The state statute at issue required that a

list of agencies offering alternatives to abortion and a description of fetal development be provided. The Court described those materials as "an outright attempt to wedge the Commonwealth's message discouraging abortion into the privacy of the informed-consent dialogue between the woman and her physician." *Id.* 476 U.S. at 762, 106 S.Ct. at 2179. The Court explicitly condemned the requirement of a list of agencies providing alternatives to abortion as a distortion of the physician-patient relationship:

> Even the listing of agencies ... presents serious problems; it contains names of agencies that well may be out of step with the needs of the particular woman and thus places the physician in an awkward position and infringes upon his or her professional responsibilities. Forcing the physician or counselor to present the materials and the list to the woman makes him or her in effect an agent of the State in treating the woman and places his or her imprimatur upon both the materials and the list..... All this is, or comes close to being, state medicine imposed upon the woman, not the professional medical guidance she seeks, and it officially structures—as it obviously was intended to do—the dialogue between the woman and her physician.

*Id.* at 762–63, 106 S.Ct. at 2179–80 (citation omitted).

The regulations at issue here attempt to structure the physician-patient dialogue and thereby influence a woman's choice between childbirth and abortion even more completely than the informed consent provisions at issue in *Akron* and *Thornburgh.* Not only do the regulations *require* the Title X project to furnish all clients with "a list of available providers that promote the welfare of the mother and unborn child," but they also *forbid* Title X projects from providing "counseling concerning the use of abortion as a method of family planning or ... referral for abortion as a method of family planning." 42 C.F.R. § 59.8(a).

The requirement that a list of agencies offering prenatal care be provided, standing alone, could well be enough to strike down the entire set of regulations because it attempts to persuade a woman to opt for childbirth over abortion by presenting limited and biased information and by rendering the decision to abort more difficult. Furthermore, the requirement forces the attending physician to endorse providers that "well may be out of step with the needs of the particular woman." The listing of agencies does not stand alone, however. By coupling that requirement with a prohibition against nondirective counseling or referral to an abortion provider, regardless of the doctor's judgment concerning the most appropriate medical care or the woman's request for specific information, the Secretary has intruded even further into constitutionally protected decisionmaking.

Read together, the new regulations force all Title X projects to provide incomplete and skewed information and to withhold requested, possibly even medically advisable, information. Paraphrasing *Thornburgh,* we find:

> The [federal government is] not free, under the guise of protecting maternal health or potential life, to intimidate women into continuing pregnancies. Appellant[ ] claim[s] that the [regulations] before us today further legitimate compelling interests of the [government]. Close analysis of those [regulations], however, shows that they wholly subordinate constitutional privacy interests and concerns with maternal health in an effort to deter a woman from making a decision that, with her physician, is hers to make.

*Id.* at 759, 106 S.Ct. at 2178.

The regulations also run afoul of our holding in *Planned Parenthood League of Massachusetts v. Bellotti,* 641 F.2d 1006 (1st Cir.1981), in which we invalidated a twenty-four hour waiting period requirement contained in a Massachusetts statute regulating abortions because it constituted "a substantial state-created burden on a woman's fundamental right," unjustified by a compelling state interest. *Id.* at 1015. The waiting period posed a substantial burden because the delay increased the medical risks of abortion and increased the an-

cillary costs to a woman desiring an abortion:

> [T]he fact that the form must be signed at least 24 hours prior to an abortion necessitates that a woman undertake at least two separate trips to obtain an abortion.... This effect necessarily imposes burdens in terms of time, money, travel and work schedules; for many women, particularly the poor, the rural, and those with pressing obligations, these burdens will be substantial.

*Id.* (citations omitted). *Accord Akron,* 462 U.S. at 450–51, 103 S.Ct. at 2503–04 (twenty-four hour waiting period invalid because it intrudes upon physician discretion). Similar burdens are imposed upon Title X clients under the new regulations. By prohibiting nondirective counseling and eliminating all agencies providing abortions from referral lists, the regulations impose substantial delay and additional costs upon a woman desiring to terminate her pregnancy. Some low-income women may be unable to obtain any information on abortion at all without the help of Title X clinic. For others, the delay between the moment when they learn of their pregnancy and the time they obtain information on abortion may greatly increase the risks inherent in the abortion procedure.[7]

Our discussion in *Bellotti* of the Massachusetts informed consent requirement is also informative. The consent form mandated by the statute required a discussion of the abortion procedure, a description of fetal development and a statement that the decision *not* to abort would not constitute grounds for the denial of public assistance. We found that although the form "comes close to an impermissible intrusion into the physician-patient relation," several factors saved it from invalidity. 641 F.2d at 1017. Most importantly, we noted that the statute did not require a physician personally to read the form to the patient or to verify

that she had read it herself, and that a physician could offer any additional information she felt necessary: "[T]he physician remains completely free to give any additional information desired regarding abortion, whether complementary to or contradictory of the information contained in the ... form." *Id.* at 1017–18 (footnote omitted). That saving characteristic is not present in the new regulations. To the contrary, the regulations prohibit a wide range of additional information. According to Dr. Morley, this prohibition not only endangers the health of the woman, but it also contravenes medical ethics:

> [I]f all a health care professional is able to do in a situation where medical treatment is indicated is to advise the patient of the diagnosis and refer, such a limitation also would violate medical ethics and standard of practice. When a condition warranting treatment is diagnosed, even if referral is required, it is necessary to counsel on all options (including abortion) and make a referral consistent with the patient's informed decision.

Affidavit of Dr. George W. Morley, *reprinted in* J.A. at 32. The regulations, therefore, not only attempt to influence a woman's decision but they also place a straightjacket on the physician, forcing her to depart from accepted standards of practice. The Court explicitly has rejected such regulation. *See Akron,* 462 U.S. at 431, 103 S.Ct. at 2493 (state may not regulate in manner which causes departure from "accepted medical practice").

The effect of the new regulations is to infringe upon women's freedom of reproductive choice by denying them access to important information and by interfering with the physician-patient relationship. These encroachments most often occur during the first trimester of pregnancy, when

---

7. Dr. George Morley, president of the American College of Obstetricians and Gynecologists, stated in his affidavit that the delay caused by the new regulations might endanger women by pushing the time of abortion into the second trimester of pregnancy. He explained: "Abortions performed later in pregnancy are closely associated with increased morbidity and mortality risks. For example, although only a small percentage of abortions are performed during the second trimester of pregnancy, they caused approximately half of all abortion-related deaths between 1972 and 1981." Affidavit of George W. Morley, M.D., *reprinted in* J.A. at 27, 30.

a woman's privacy interests are most unrestricted:

> [F]or the period of pregnancy prior to [the end of the first trimester], the attending physician, in consultation with his patient, is free to determine, without regulation by the State, that, in his medical judgment, the patient's pregnancy should be terminated. If that decision is reached, the judgment may be effectuated by an abortion free of interference by the State.

*Roe*, 410 U.S. at 163, 93 S.Ct. at 734. We recognize, of course, that even during the first trimester, a woman's privacy right is not absolute. In *Akron*, the Court held:

> Certain regulations that have no significant impact on the woman's exercise of her right may be permissible where justified by important state health objectives.... But even these minor regulations on the abortion procedure during the first trimester may not interfere with the physician-patient consultation or with the woman's choice between abortion and childbirth.

462 U.S. at 430, 103 S.Ct. at 2492 (citation omitted).

In his brief, the Secretary has neither argued that the regulations advance important health objectives nor refuted appellees' contention that they interfere with the physician-patient dialogue and a woman's freedom of reproductive choice. Rather the Secretary has relied solely on *Webster*, *Maher*, and *McRae* claiming that the regulations reflect a legitimate funding decision to favor childbirth over abortion. Those cases do not change our result.

In *Webster*, the Court reversed an Eighth Circuit opinion that had declared the public funding restrictions of a Missouri abortion law unconstitutional. The law prohibited public facilities from being used for or public employees from performing or assisting most abortions. In upholding the law, the Court relied upon and reaffirmed the teachings of *McRae* and *Maher*. *Webster*, 109 S.Ct. at 3051–53. The Court stated that Missouri's choice "to use public facilities and staff to encourage childbirth over abortion 'places no governmental obstacle in the path of a woman who chooses to terminate her pregnancy.' " *Webster*, 109 S.Ct. at 3052 (*quoting McRae*, 448 U.S. at 315, 100 S.Ct. at 2687.)

The Eighth Circuit had also struck down a portion of the Missouri law that prohibited the use of state funds or facilities for counseling or encouraging a woman to have an abortion. In addition, state employees were prohibited from counseling or encouraging abortions. The State did not appeal the decisions on the uses of state facilities or employees for counseling, so those rulings still stand. In appealing the limitation on the use of state funds for counseling, Missouri construed the law as only limiting the actions "of those persons responsible for expending public funds" and stated that the restriction "is not directed at the conduct of any physician." *Webster*, 109 S.Ct. at 3053. Because of that limiting definition, the *Webster* plaintiffs were no longer adversely affected by the law and the Eighth Circuit's decision was unanimously held moot. *Webster*, 109 S.Ct. at 3053–54. In discussing the mootness issue several justices noted that if the ban were interpreted to "prohibit publicly employed health professionals from giving specific medical advice to pregnant women," a serious controversy would exist. *Id.* at 3060 (O'Connor, J., concurring); *Id.* at 3068–69 n. 1 (Blackmun, Brennan, and Marshall, JJ., concurring in part and dissenting in part).

In *Maher*, the Court upheld a regulation promulgated by the Connecticut Welfare Department that limited state Medicaid benefits for first trimester abortions to those which were deemed medically necessary. The Court found that although the regulations may well have rendered childbirth a more "attractive alternative," they imposed no restrictions on a woman's access to abortion and thereby did not infringe upon her constitutional right to reproductive choice. 432 U.S. at 474, 97 S.Ct. at 2382. The Court explicitly distinguished the regulations under consideration from a government effort to restrict a woman's freedom in decisionmaking: "Our conclusion signals no retreat from *Roe* or the

cases applying it. There is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy." *Maher*, 432 U.S. at 475, 97 S.Ct. at 2383 (footnote omitted).

The Court affirmed *Maher*'s reasoning in *McRae* by upholding an amendment to Title XIX of the Social Security Act that restricted the use of federal Medicaid funds to support certain medically necessary abortions. The Court explained that the amendment created no obstacle to a woman's freedom of choice: "The financial constraints that restrict an indigent woman's ability to enjoy the full range of constitutionally protected freedom of choice are the product not of governmental restrictions on access to abortions, but rather of her indigency." *McRae*, 448 U.S. at 316, 100 S.Ct. at 2687 (citing *Maher*).

The emphasis in both *Maher* and *McRae* was on preexisting limitations on a woman's access to abortion which the government failed to alleviate through funding.[8]

The distinction between refusals to fund abortion and incursions upon the decisional process is explicitly recognized and illustrated by a juxtaposition of text and footnote in *Akron*. In the body of its opinion, the Court stated that while some informed consent provisions *may* pass constitutional muster, the state could not attempt to direct the flow of information on abortion through such provisions:

> This does not mean, however, that a State has unreviewable authority to decide what information a woman must be given before she chooses to have an abortion. It remains primarily the responsibility of the physician to ensure

that appropriate information is conveyed to his patient, depending on her particular circumstances. *Danforth*'s recognition of the State's interest in ensuring that this information be given will not justify abortion regulations designed to influence the woman's informed choice between abortion or childbirth.

*Akron*, 462 U.S. at 443–44, 103 S.Ct. at 2499–2500. In a footnote to this passage, the Court distinguished state provisions designed to effect the decisional process by regulating the flow of information from the provisions at issue in *Maher* and *McRae* which merely provided financial support for a policy choice: "This legislation to further an interest in preferring childbirth over abortion was permissible ... only because it did not add any 'restriction on access to abortions that was not already there.'" *Akron*, 462 U.S. at 444 n. 33, 103 S.Ct. at 2500 n. 33 (citing *Maher*, 432 U.S. at 474, 97 S.Ct. at 2382). As we mentioned initially, *Webster* reaffirmed the validity of *McRae* and *Maher*.

## V. OBSTACLES TO ABORTION CREATED BY THE REGULATIONS

In the instant case, the Secretary's policy does not merely fail to remove obstacles to abortions—it creates obstacles. By insisting upon a one-sided flow of information to Title X clients and by prohibiting the provision of nondirective counseling, the regulations place significant limitations upon a woman's freedom of reproductive choice. In *Akron*, the Court specifically recognized that denial of information about abortion (rather than funding) was an impermissible

---

**8.** *See, e.g.,* the hypothetical case discussed in *McRae:*

> A substantial constitutional question would arise if Congress had attempted to withhold all Medicaid benefits from an otherwise eligible candidate simply because that candidate had exercised her constitutionally protected freedom to terminate her pregnancy by abortion. This would be analogous to *Sherbert v. Verner*, 374 U.S. 398 [83 S.Ct. 1790, 10 L.Ed.2d 965], where this Court held that a State may not, consistent with the First and Fourteenth Amendments, withhold *all* unemployment benefits from such a claimant who would

otherwise be eligible for such benefits but for the fact that she is unwilling to work one day per week on her sabbath.

448 U.S. at 317 n. 19, 100 S.Ct. at 2688 n. 19. Similarly in *Maher* the Court stated that

> If Connecticut denied general welfare benefits to all women who had obtained abortions and who were otherwise entitled to benefits, we would have a close analogy to the facts in *Shapiro [v. Thompson]*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 and strict scrutiny might be appropriate....

432 U.S. at 474 n. 8, 97 S.Ct. at 2383 n. 8.

obstacle. *Akron,* 462 U.S. at 445, 103 S.Ct. at 2500. Due to the combination of government compelled disclosures and nondisclosure, a Title X client will make a decision concerning her pregnancy based upon a distorted consultation marred by medically incomplete information and referrals. *Cf.* Benshoof, *The Chastity Act: Government Manipulation of Abortion Information and the First Amendment,* 101 Harv.L. Rev. 1916, 1921–22 (1988) (government sponsored programs prohibited from providing abortion counseling or referral "manipulate the abortion decision itself by deliberately providing distorted information.") (footnote omitted). Both *Maher* and *McRae* emphasized that the contested provisions left the woman's decisional process intact; in the instant case, that process is undermined through a government crafted restructuring of the physician-patient dialogue. Regulating the substance of the dialogue between physician and patient in order to influence a woman's decision concerning her pregnancy creates a new and imposing obstacle to abortion.

We are particularly struck by the effect these restrictions have on poor women who are forced to rely on Title X clinics. They are significantly worse off than they would have been if the government had not provided the clinics because they have received misinformation rather than no information about their options. In addition, because most Title X clients pay a portion of the cost of the services (based on a sliding scale), the client's ability to go elsewhere has been significantly diminished because she has already paid what she could afford to the Title X clinic.

The regulations create an additional obstacle by restricting the private funds available for abortion counseling and services. As we have said before, "the abortion funding cases stand for the proposition that the state cannot refuse to make grants to an organization that encourages or performs abortions if those abortion related funds are derived from nongovernmental sources." *Student Government v. Bd. of Trustees,* 868 F.2d 473, 481 (1st Cir.1989).[9]

By not only refusing to fund abortions, but also restricting nongovernmental money that may be used for abortion services, these regulations create an additional obstacle in the exercise of a woman's right to reproductive choice.

## VI. OTHER COURT DECISIONS ON TITLE X FUNDING

Other courts have declared unconstitutional the obstacle to abortion created by government limitations upon the flow of information. In *Planned Parenthood Assoc. v. Kempiners,* 531 F.Supp. 320 (N.D. Ill.1981), *vacated and remanded on other grounds,* 700 F.2d 1115 (7th Cir.1983), *aff'd on reh'g,* 568 F.Supp. 1490 (N.D.Ill.1983), the court held that a state statute denying funding to programs directed at problem pregnancies solely because such programs offered abortion counseling and referral unconstitutionally interfered with a woman's right to reproductive choice. The court stated:

> The state may seek to encourage women to make a voluntary and intelligent decision not to terminate their pregnancy, but it may not seek to encourage women to make this decision in ignorance. In *Maher* and *McRae,* the State merely declined to subsidize abortion. It did not seek to preclude women from making an independent and knowing bearing choice. Here, the state does seek to impair the intelligence and independence of the

9. Assuming that *Student Government v. Bd. of Trustees,* 868 F.2d 473 (1st Cir.1989) is controlling, as Judge Torruella argued in his dissent to the panel opinion, that opinion does not change our holding. *Student Government* stands for the proposition that the government may stop funding of activities that it is not required to fund based on the content of the activity. That holding is consistent with, and in fact relies upon, *McRae* and the other abortion funding cases. But *Student Government* is significantly different from the position urged here by the government. It did not involve any limitation upon the exercise of first amendment rights, only a limitation on the funding of those rights. In addition, it did not place any limitation on the use of private money to fund the activities that the government would no longer support. Finally, the result of *Student Government* was that the government would not fund certain activity, rather than as here, that agency clients will be affirmatively misled.

woman's choice. That goal is constitutionally impermissible, and the state may not make funding choices on such impermissible bases.

531 F.Supp. at 329 (citation omitted). Similarly, in *Planned Parenthood Fed. of America*, 680 F.Supp. 1465, a Colorado federal district court enjoined the enforcement of the regulations currently before us, holding *inter alia*, that the regulations violated a woman's right to decide whether to terminate her pregnancy by restricting the flow of information necessary to make that decision: "Restricting a woman's only means of access to vital information renders her right to decide whether to have an abortion largely illusory." *Id.* at 1475.

The circuit court in *Webster* decided a similar issue, and reached a similar conclusion which was not appealed to the Supreme Court. *Reproductive Health Servs. v. Webster*, 851 F.2d 1071 (8th Cir.1988). The Eighth Circuit declared unconstitutional the prohibition in the Missouri abortion regulation statute against the use of public funds, employees or facilities to encourage or counsel a woman to have an abortion. The court rejected the state's reliance upon *Maher* and *McRae:*

> We think that the state's analogy of its ban on 'encouraging or counseling' to bans on public abortion funding is completely inapt. Missouri is not simply declining to fund abortions when it forbids its doctors to encourage or counsel women to have abortions. Instead, it is erecting an obstacle in the path of women seeking full and uncensored medical advice about alternatives to childbirth. The state's limitation on doctor-patient discussions reflects the state's choice for childbirth over abortion in a way that

prevents the patient from making a fully informed and intelligent choice.

> This state-created obstacle to exercise of the right to choose an abortion thus is far-removed from a state's refusal to remove obstacles not of its own creation.... We can perceive of few obstacles more burdensome to the right to decide than a state-imposed blackout on the information necessary to make a decision. We therefore affirm the district court's judgment that the state's ban on "encouraging or counseling" is an unconstitutional infringement of the right to choose an abortion protected by the fourteenth amendment.

*Id.* at 1080.[10]

We recognize that the Court of Appeals for the Second Circuit has upheld the same regulations that are challenged here. *New York v. Sullivan*, 889 F.2d 401 (2d Cir. 1989). That court relied heavily on *Webster's* reaffirmance of *McRae* and *Maher*. As we have noted, we do not think that those cases require reversal here. Our fundamental disagreement with the majority in *New York v. Sullivan* stems not from a different reading of Supreme Court cases, but rather from our different reading of the language of the regulations. The Second Circuit, it appears to us, ignored the fact that private money ("matching funds") is tied up and held hostage to the same restrictions as Title X funds because of the new definition of the "Title X program" in the regulations. Its opinion treats the regulations as if they only applied to federal money without also placing significant conditions on matching funds. For this reason the Second Circuit refused to give serious consideration to *Thornburgh* and *Akron*. It distinguished *Akron* and *Thornburgh* on the ground that those

---

10. Another court has struck down additional HHS regulations that seek to implement the regulations that are at issue here by creating stricter reporting requirements for abortion "advocacy" groups. *Planned Parenthood Federation of America v. Sullivan*, slip op. 88–5565, 1989 WL 149755 (E.D.Pa. Dec. 7, 1989). The district court held that the regulations violated Title X and the first amendment. It stated

> [i]t is apparent that [the] revised [regulations] are no more than a fairly obvious attempt on

the part of HHS to circumvent the APA, Title X, and the Constitution, in order to accomplish administratively what Congress could not be persuaded to do and to evade judicial review by issuing substantive rules in the guise of interpretive ones. I hold, therefore, that [the regulations] are illegal and unconstitutional.

Slip op. at 19.

cases did not involve public funds, only the regulation of information. *Id.* at 413. But if information restrictions are invalid in general, how can they be valid in the limited situations of public funds? It is axiomatic that the government cannot do indirectly (i.e. through funding decisions) what it cannot do directly.

The Second Circuit's sweeping affirmation of the Secretary's power to write regulations that impose significant burdens on Title X programs and upon the rights of individuals is qualified in two paragraphs at the end of the opinion. These qualifications throw into sharp relief our differences. The first qualification discusses what would arise if a doctor were to treat a "private patient" in a Title X clinic. *Id.* at 413–14. The Second Circuit seemed to feel that this would raise an important issue and that it was not present in these regulations (or at least in the record before the court). We understand the thrust of the new regulations is to prevent exactly that. The regulations prohibit a "private patient" from being treated in a Title X clinic and a doctor in a Title X clinic from having "private patients" treated there. That is the clear intent of the new definitions and the integrity regulations. The majority of the Second Circuit panel ignored this significant limitation imposed by the regulations.

The second qualification in the Second Circuit's opinion (that the regulations are neutral because they limit both "pro and con" advocacy about abortion) was dealt with by Judge Kearse in her thoughtful dissent. The majority states that the regulations are neutral because they prohibit any discussion about abortion. It is naive to assert that not talking about abortion to a pregnant woman when discussing her options is value-neutral. In addition, the regulations are not even facially neutral because they allow postconceptional counseling in the best interests of the unborn child but not regarding abortion. By discussing only what is best for the unborn child, the counselor has already made the woman's choice. The Government, in restricting the counselor's options to that choice, enforces its choice.

We find that the prohibition in the regulations against counseling or referral with respect to abortion imposes constraints upon a woman's freedom to make reproductive decisions. This limitation upon a woman's range of choice in deciding whether to carry to term or terminate her pregnancy constitutes a government created obstacle in violation of *Roe v. Wade* and its progeny. The Secretary has gone beyond a mere refusal to fund and has interfered with the decisional process by dictating what information a woman may receive and by intruding into her relationship with her physician. This he may not do. We therefore enjoin the Secretary from enforcing or applying the counseling or referral provisions of the new regulations.

## VII. FIRST AMENDMENT ANALYSIS OF THE RESTRICTIONS

■■■ The regulations before us forbid, as a condition of receiving funding, certain categories of speech, such as "counseling concerning the use of abortion," and "advocat[ing] abortion as a method of family planning." 42 C.F.R. §§ 59.8, 59.10. Appellees argue that the new regulations not only violate the constitutional right to reproductive choice but also infringe upon the protections found in the first amendment, relying on *FCC v. League of Women Voters*, 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984). We agree.

The Supreme Court has made clear that "conditions upon public benefits cannot be sustained if they so operate, whatever their purpose, as to inhibit or deter the exercise of First Amendment freedoms." *Sherbert v. Verner*, 374 U.S. 398, 405, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965 (1963). This doctrine is long standing:

> For at least a quarter-century, this Court has made clear that even though a person has no "right" to a valuable government benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that in-

fringes his constitutionally protected interest—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech, ... his exercise of those freedoms would in effect be penalized and inhibited.

*Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972).

In determining whether the government may ever so condition a grant or benefit, the Court normally has applied a "strict scrutiny" test, and insisted that the government show a "compelling interest." *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 231, 107 S.Ct. 1722, 1728, 95 L.Ed.2d 209 (1987) (striking down content-based sales tax exemption for magazines). *See also FCC v. League of Women Voters*, 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984).

In *FCC v. League of Women Voters*, the Court held that the government may not give federal funds to public radio and television stations upon the condition that the stations not engage in editorializing. The Court noted that the editorial ban was "defined solely on the basis of the content of the suppressed speech," it constituted a pure example of speech regulation "motivated by nothing more than a desire to curtail expression of a particular point of view on controversial issues," and the government could satisfy its asserted interests (not using taxpayer money to promote views with which taxpayers may disagree or to promote government propaganda, and preventing the capture of stations by private interest groups) in "less restrictive" ways. *Id.* at 383–84, 104 S.Ct. at 3119–20.

For reasons that are similar, or even more compelling, the Title X regulations violate the first amendment. First, the need to protect the speech at issue here is even more important than public radio editorializing. The speech involves informing a woman about the existence of a health and privacy related activity in which she

has a constitutional right to engage. Moreover, in context it is far less likely here than in the case of radio editorializing that a member of the relevant public will be adequately exposed to the relevant message content elsewhere. Given the educational and social handicaps of the women who depend upon Title X clinics, they may not learn much about the "pro/anti abortion" considerations elsewhere; and, in any event, they are likely to attach special importance to what a doctor tells them at a family planning clinic. At the same time, the regulations do not create "content-neutrality." Rather, they slant the content of the relevant counseling in an "antiabortion" direction; they insist that the doctors include on any list of "referrals" for prenatal, social service, or emergency medical services all "available providers who do not provide abortions," but they must exclude any provider "whose principal business is the provision of abortions." 42 C.F.R. § 59.8. *See Consolidated Edison Co. v. Public Service Comm'n*, 447 U.S. 530, 537–38, 100 S.Ct. 2326, 2333–34, 65 L.Ed.2d 319 (1980) (first amendment is hostile to content-based regulation, and such regulation is approved only in certain narrow circumstances). In addition, the prohibited speech will often involve communications between a patient and doctor, an area (given the "life" and "liberty" interests potentially involved) warranting particularly strong protection. *Akron*, 462 U.S. at 445, 103 S.Ct. at 2500 (state must not put physician in a "straightjacket"); *Thornburgh*, 476 U.S. at 762–63, 106 S.Ct. at 2179–80.

Second, the regulations impede the fund recipient from engaging in the protected activity no less than the statute the Court struck down in *League of Women Voters, supra.* The federal funds in *League of Women Voters* amounted to about 25% of the total income for all public broadcasting stations. *Id.* at 390 n. 19, 407, 104 S.Ct. at 3121 n. 19, 3131. In this case they can be much less.[11] Moreover, the regulations re-

---

**11.** The federal funds in this case, by statute cannot amount to more than 90% of the funds available for a Title X family planning project; but the government, at oral argument, said that

the federal government provides only about 50% of the money supporting federally funded family planning projects; and affidavits in the case show that some family planning organiza-

quire that any forbidden counseling activity must be "physically and financially separate" from any Title X project activity. These facts show that the regulations directly restrict the use of a significant amount of private money (the 10% or more that the private organizations spend within the Title X program). They also strongly suggest that family planning organizations typically mix their own funds with federal funds to build and to operate a single building or set of rooms, say, within a hospital. How then, without incurring impractically high, extra costs, could family planning clinic operators build separate rooms, entrances, or buildings solely for the purpose of taking a patient in the midst of family planning, moving her to a separate place, and counseling her about the availability of abortions? The practical effect of the regulations is to restrict significantly the ability of the recipient organization to engage in the forbidden counseling, even on its own time with its own money. At the least, it seems no easier here for a family planning organization to build its own private clinic to counsel abortion than for a federally funded public radio station to build its own separate, non-federally funded public radio station to editorialize. The government has said nothing that would make any contrary view plausible.

· Third, the only "governmental interest" that the regulations seek to further is the government's interest in making certain its own money is not spent for a purpose outside the scope of its funded program.[12] But, the government could easily withdraw the "physically separate" facilities requirement, make the "counseling" regulations less slanted, and provide various forms of "bookkeeping" rules. These "less restrictive alternatives" would be as likely to prove effective here as in *League of Women Voters*. Regardless, the Supreme Court has frequently held that the government

cannot prevent even its direct employees from exercising their First Amendment rights, even on the *government's time*. *See Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) (state may not discharge employee for exercise of free speech during work hours). That the government cannot restrict privately financed, unusually important, speech activities simply to achieve an ironclad guarantee that its funds are not "improperly spent" would seem to follow *a fortiori*.

Fourth, in *League of Women Voters*, the Court found a violation of the First Amendment, even though it did *not* use a "strict scrutiny/compelling interest" standard. It did not use this standard in light of what it saw as an unusually strong government interest in regulating broadcasting. Here there is no such interest; to the contrary, privacy interests suggest an unusually strong interest in *not* regulating. Hence, there is no reason not to use the normal "strict scrutiny" tests; and the result here should therefore follow *a fortiori*.

The Secretary argues that the denial of funding for activities that "encourage, promote or advocate abortion as a method of family planning," section 59.10(a), reflects a legitimate decision, under the principles set forth in *Regan v. Taxation with Representation of Washington*, 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983), to refuse to subsidize lobbying. *Regan* involved a challenge to a provision of the tax code that stated that contributions to nonprofit organizations engaging in lobbying would *not* be tax-deductible. The Court held the provision constitutional, stating that Congress has no obligation to fund advocacy activities. *Id.* at 546, 103 S.Ct. at 2001.

The regulations before us differ in a significant respect from those considered in *Regan*.[13] By prohibiting advocacy related

tions receive as little as 9% of their total operating budget from Title X.

**12.** We note that a report issued by the Comptroller General in 1982 found no evidence that Title X funds were used by any of the grantees to provide abortions or to advise clients to have abortions. *See* Report by the Comptroller Gen-

eral of the United States (Sept. 24, 1982), *reprinted in* J.A. at 125, 127.

**13.** Had we not found that the physical and financial separation requirements imposed by section 59.9 violate Congress' intent to foster coordinated family planning services, *see supra* at 58, we would nevertheless be required to

to abortion, the regulations impose a restriction that is both viewpoint and content-based in violation of the first amendment. The *Regan* Court explicitly stated that its holding did not endorse funding decisions calculated to suppress specific ideas: "The case would be different if Congress were to discriminate invidiously in its subsidies in such a way as to 'ai[m] at the suppression of dangerous ideas.'" *Regan*, 461 U.S. at 548, 103 S.Ct. at 2002 (quoting *Cammarano v. United States*, 358 U.S. 498, 513, 79 S.Ct. 524, 533, 3 L.Ed.2d 462 (1959) (quoting *Speiser v. Randall*, 357 U.S. 513, 519, 78 S.Ct. 1332, 1338, 2 L.Ed.2d 1460 (1958)). The Court further distinguished an unlawful attempt to suppress "dangerous ideas" from the clearly lawful decisions in *McRae* and *Maher* to fund certain activities differentially in accordance with a conception of the public interest. *Regan*, 461 U.S. at 549–50, 103 S.Ct. at 2003–04.[14]

The new regulations fall squarely on the unconstitutional side of the line drawn in *Regan*. Section 59.10 does not merely prohibit lobbying by a recipient organization; it prohibits *abortion-related* advocacy. The Court has held repeatedly that the government may not prohibit speech on the basis of "its message, its ideas, its subject matter, or its content." *Police Dept. of the City of Chicago v. Mosley*, 408 U.S. 92, 95, 92 S.Ct. 2286, 2289, 33 L.Ed.2d 212 (1972) (citations omitted). Section 59.10 violates the prohibition by attempting to suppress

pro-choice advocacy. The Secretary argues that the regulations are not viewpoint-based because they prohibit *all* advocacy concerning abortion, whether in support of or in opposition to the availability of abortion as a method of family planning. We find that argument factually untenable. The examples of prohibited activities listed in section 59.10(b), and reproduced in Appendix B, all concern actions that *promote* abortion; not one example concerns anti-abortion advocacy. But even were we to accept the Secretary's interpretation, the regulations would still fall as a content-based regulation: "The First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic." *Consolidated Edison Co. v. Public Serv. Comm'n*, 447 U.S. 530, 537, 100 S.Ct. 2326, 2333, 65 L.Ed.2d 319 (1980). Through the medium of funding, the Secretary has attempted to limit public discussion on abortion rights. It is by now black letter law that such a restriction is a violation of the first amendment.

## VIII. SEVERABILITY

 In his dissent to the panel opinion, Judge Torruella argued that we should strike down the most pernicious aspects of the regulations[15] but leave the rest of the regulations intact, asserting that the of-

strike them down on constitutional grounds. The requirements impose a greater burden on Title X grantees than those considered by the Court in *Regan*. We illustrate briefly. Under the provisions of the Internal Revenue Code, an organization need show only separate incorporation and record keeping vis-a-vis its lobbying affiliate in order to qualify for tax deductible contributions. The Court found those requirements "not unduly burdensome." *Regan*, 461 U.S. at 544–45 n. 6, 103 S.Ct. at 2000–01 n. 6. But should §§ 59.9 and 59.10 be enforced as written, a Title X grantee would be subject to much more stringent regulation. Under section 59.9, the Secretary will consider not only the existence of separate bookkeeping, but also the separation of physical facilities and personnel, in determining whether a grantee is tainted by prohibited activities. On a practical level, this requirement is significantly more onerous than

the purely paperwork requirements at issue in *Regan*.

14. Unlike this case, however, as the *Regan* Court noted, it was easy for the charities wishing to engage in lobbying to use separate incorporation and accounting methods simply to make certain that the "tax deductible" contributions did not pay for the lobbying activities. The HHS regulations here specifically forbid the Title X organization to do this. Moreover, the regulations here are not content neutral; and, as previously pointed out, the speech here is unusually significant. In any event, the Court, in *League of Women Voters*, distinguished the earlier case in *Regan;* and we must follow the later of the two.

15. He invalidates § 59.9 (physical separation); § 59.2 (definitions); and § 59.8(2) (referral to pro-life services).

fending portions are severable. His analysis of the offending sections was cogent and to the point. Much of his discussion of the innocuous or permissible aspects of the regulations assumed severability. Having carefully considered his arguments, we do not agree that the offending portions of regulations can be so easily detached. We find, as the Court found in *Thornburgh*, "the radical dissection necessary would leave [the statute] with little resemblance to that intended by the legislature." *Thornburgh*, 476 U.S. at 764, 106 S.Ct. at 2180; *see also Akron*, 462 U.S. at 445 n. 37, 103 S.Ct. at 2500 n. 37.

In examining severability a court must examine the functional independence of the valid and invalid provisions and the intent of the enacting legislature. *Keith Fulton & Sons v. New England Teamsters*, 762 F.2d 1124, 1136 (1st Cir.1985). Judge Torruella would have struck the definition section that is the basis for the rest of the regulations. The regulations draw their power from the broad definition of a Title X program. Without the definition, none of the regulations are the same. Striking the definitional section of the regulations, but not the regulations themselves, eviscerates the guiding intent of the regulations and completely changes their meaning. This we cannot do.

All of the information before us leads us to believe that the Secretary intended that the regulations should be considered as a whole and that the Secretary would prefer that they be considered as a whole. There is no severability clause in the regulations creating a presumption of non-severability. *See e.g., Carter v. Carter Coal Co.*, 298 U.S. 238, 312, 56 S.Ct. 855, 873, 80 L.Ed. 1160 (1936). In addition, the Secretary has never argued, as far as we can tell, that the regulations are severable. He certainly does not so argue in his brief. Severability was not argued below or before us in either case. Judge Torruella argued that severability is appropriate because if we strike the entire scheme of regulations "Title X programs [are given] free reign ... to support or promote abortion as is deemed fit." But he ignored the fact that under the old regulations Title X programs could not promote abortion. *See also* Supp. Brief of NFPRHA 21 n. 12 (discussing what they think would happen if we struck the regulation). Of course, in addition, all Title X programs would still be bound by the statutory prohibition found in § 1008. Based on our reasoning, and that of Judge Torruella, certain of the regulations are unconstitutional. We find that the regulatory scheme is such that the offending regulations cannot be severed.

## IX. CONCLUSION

For the reasons stated above, we enjoin the enforcement of the new regulations.

*Affirmed.*

Costs awarded to appellees.

Circuit Judge CYR has indicated that he does not participate in the consideration and determination of this case.

## APPENDIX A

The relevant provisions of the new regulations provide as follows:

§ 59.2 [Amended]

\*　　\*　　\*　　\*　　\*　　\*

"Family planning" means the process of establishing objectives for the number and spacing of one's children and selecting the means by which those objectives may be achieved.... Family planning does not include pregnancy care (including obstetric or prenatal care). As required by section 1008 of the Act, abortion may not be included as a method of family planning in the Title X project. Family planning, as supported under this subpart, should reduce the incidence of abortion....

"Title X" means Title X of the Act, 42 U.S.C. 300, *et seq.*

"Title X program" and "Title X project" are used interchangeably and mean the identified program which is approved by the Secretary for support under ... the Act.... Title X project funds include all funds allocated to the Title X program, including but not limited to grant funds, grant-related income or matching funds.

§ 59.8 *Prohibition on counseling and referral for abortion services; limitation of program services to family planning.*

(a)(1) a Title X project may not provide counseling concerning the use of abortion as a method of family planning or provide referral for abortion as a method of family planning.

(2) Because Title X funds are intended only for family planning, once a client served by a Title X project is diagnosed as pregnant, she must be referred for appropriate prenatal and/or social services by furnishing a list of available providers that promote the welfare of mother and unborn child. She must also be provided with information necessary to protect the health of mother and unborn child until such time as the referral appointment is kept. In cases in which emergency care is required, however, the Title X project shall be required only to refer the client immediately to an appropriate provider of emergency medical services.

(3) A Title X project may not use prenatal, social service or emergency medical or other referrals as an indirect means of encouraging or promoting abortion as a method of family planning, such as by weighing the list of referrals in favor of health care providers which perform abortions, by including on the list of referral providers health care providers whose principal business is the provision of abortions, by excluding available providers who do not provide abortions, or by "steering" clients to providers who offer abortion as a method of family planning.

(4) Nothing in this subpart shall be construed as prohibiting the provision of information to a project client which is medically necessary to assess the risks and benefits of different methods of contraception in the course of selecting a method; *provided,* that the provision of this information does not include counseling with respect to or otherwise promote abortion as a method of family planning.

§ 59.9 *Maintenance of program integrity.*

A Title X project must be organized so that it is physically and financially separate, as determined in accordance with the review established in this section, from activities which are prohibited under section 1008 of the Act and § 59.8 and § 59.10 of these regulations from inclusion in the Title X program. In order to be physically and financially separate, a Title X project must have an objective integrity and independence from prohibited activities. Mere bookkeeping separation of Title X funds from other monies is not sufficient. The Secretary will determine whether such objective integrity and independence exist based on a review of facts and circumstances. Factors relevant to this determination shall include (but are not limited to):

(a) The existence of separate accounting records;

(b) The degree of separation from facilities (*e.g.,* treatment, consultation, examination, and waiting rooms) in which prohibited activities occur and the extent of such prohibited activities;

(c) The existence of separate personnel;

(d) The extent to which signs and other forms of identification of the Title X project are present and signs and material promoting abortion are absent.

§ 59.10 *Prohibition on activities that encourage, promote or advocate abortion.*

(a) A Title X project may not encourage, promote or advocate abortion as a method of family planning. This requirement prohibits actions to assist women to obtain abortions or increase the availability or accessibility of abortion for family planning purposes. Prohibited actions include the use of Title X project funds for the following:

(1) Lobbying for the passage of legislation to increase in any way the availability of abortion as a method of family planning;

(2) Providing speakers to promote the use of abortion as a method of family planning;

(3) Paying dues to any group that as a significant part of its activities advocates abortion as a method of family planning;

(4) Using legal action to make abortion available in any way as a method of family planning; and

(5) Developing or disseminating materials (including printed matter and audiovisual materials) advocating abortion as a method of family planning.

## APPENDIX B

Section 59.10(b) provides, in relevant part:

59.10 *Prohibition on activities that encourage, promote or advocate abortion.*

. . . .

(b) *Examples.* (1) Clients at a Title X project are given brochures advertising an abortion clinic. Provision of the brochure violates subparagraph (a) of this section.

(2) A Title X project makes an appointment for a pregnant client with an abortion clinic. The Title X project has violated paragraph (a) of this section.

(3) A Title X project pays dues to a state association which, among other activities, lobbies at state and local levels for the passage of legislation to protect and expand the legal availability of abortion as a method of family planning. The association spends a significant amount of its annual budget on such activity. Payment of dues to the association violates paragraph (a)(3) of this section.

(4) An organization conducts a number of activities, including operating a Title X project. The organization uses non-project funds to pay dues to an association which, among other activities, engages in lobbying to protect and expand the legal availability of abortion as a method of family planning. The associa-

tion spends a significant amount of its annual budget on such activity. Payment of dues to the association by the organization does not violate paragraph (a)(3) of this section.

(5) An organization that operates a Title X project engages in lobbying to increase the legal availability of abortion as a method of family planning. The project itself engages in no such activities and the facilities and funds of the project are kept separate from prohibited activities. The project is not in violation of paragraph (a)(1) of this section.

(6) Employees of a Title X project write their legislative representatives in support of legislation seeking to expand the legal availability of abortion, using no project funds to do so. The Title X project has not violated paragraph (a)(1) of this section.

(7) On her own time and at her own expense, a Title X project employee speaks before a legislative body in support of abortion as a method of family planning. The Title X project has not violated paragraph (a) of this section.

LEVIN H. CAMPBELL, Chief Judge (concurring).

I merely add, in joining in my brother's able opinion, that I find Judge Kearse's dissent in *New York v. Sullivan*, 889 F.2d 401, 415 (2d Cir.1989) a particularly succinct and persuasive statement in support of the result we reach here. As the Supreme Court in *Roe v. Wade* ruled that a woman's right to an abortion was constitutionally protected, I do not see how the government, consistent with the First and Fourteenth Amendments, can deny funding to those who would give objective advice on this constitutionally protected alternative.

TORRUELLA, Circuit Judge (dissenting).

In the original panel decision of this case, I concurred in part and dissented in part, based on the assumption that the regulations at issue could be severed from the

remainder of the legislation. Since that time, however, my views have been supplemented by the Supreme Court's decision in *Webster v. Reproductive Health Services,* — U.S. ——, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989), and by the Second Circuit's opinion regarding these rules in *New York v. Sullivan,* 889 F.2d 401 (2d Cir.1989). I am now convinced that these regulations, irrespective of whether or not they are subject to severance, do not interfere with any constitutional right protected pursuant to *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), or any First Amendment right as expressed in *F.C.C. v. League of Women Voters,* 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984). In my opinion, the Secretary has merely refused to fund an activity which the government is not constitutionally required to support, without imposing legal obstacles to a citizen's choice of action in a protected area. *Webster, supra; Harris v. McRae,* 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980); *Maher v. Roe,* 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977). Nor have plaintiffs' First Amendment rights been inhibited in any constitutionally cognizable way. *Regan v. Taxation with Representation of Washington,* 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983); *Student Government v. Bd. of Trustees,* 868 F.2d 473 (1st Cir.1989).

I believe that the challenged regulations are a valid exercise of executive power as authorized by Section 1008 of the Public Health Service Act, 42 U.S.C. § 300a–6. Consequently, I respectfully dissent.