PLANNED PARENTHOOD FEDERATION OF AMERICA, Planned Parenthood of the Rocky Mountains, Planned Parenthood Association of Utah, Boulder Valley Women's Health Center, Marilyn Foelski, M.D., Philip Freedman, M.D., and Kirtly Jones, M.D., Plaintiffs–Appellees,

v.

Louis SULLIVAN, M.D., individually and in his capacity as Secretary of the United States Department of Health and Human Services, Defendant–Appellant.

No. 88–2251.

United States Court of Appeals, Tenth Circuit.

Sept. 6, 1990.

Alfred Mollin, Atty., Appellate Staff, Civil Div., Dept. of Justice, Washington, D.C. (John R. Bolton, Asst. Atty. Gen., Michael J. Norton, U.S. Atty., and John F. Cordes, Atty., Dept. of Justice, Washington, D.C.; of counsel: Joel Mangel, Deputy Chief Counsel, Public Health Service; and Carol Conrad, Atty., Office of the Gen. Counsel, Dept. of Health and Human Services, with him on the briefs), for defendant-appellant.

Roger K. Evans (Dara Klassel and Beth Otten, also of Planned Parenthood Federation of America, Inc., New York City, Edwin S. Kahn and James W. Hubbell of Kelly/Haglund/Garnsey and Kahn, Denver, Colo., with him on the brief), for plaintiffs-appellees.

Kent Masterson Brown, Lexington, Ky., Charles Onofrio, Denver, Colo., and Clarke D. Forsythe, Americans United for Life Legal Defense Fund, Chicago, Ill., filed an amici curiae brief on behalf of American Academy of Medical Ethics, Ass'n of American Physicians & Surgeons, American Ass'n of Pro Life Obstetricians & Gynecologists, American Ass'n of Pro–Life Pediatricians, National Doctors for Life, Christian Medical Society, Christian Medical Found., Alabama Physicians for Life, Physicians for Moral Responsibility, National Ass'n of Pro–Life Nurses, California Pro–Life Nurses Ass'n, Georgia Nurses for Life, Indiana Nurses Concerned for Life, Missouri Nurses for Life, New York State Nurses for Life, Inc., Pennsylvania Nurses for Life, Rhode Island Nurses for Life, Washington Pro–Life Nurses Ass'n, Southern Center for Law and Ethics, and Certain Fellows and Members of the American College of Obstetricians and Gynecologists and of the American Medical Ass'n in support of defendant-appellant.

Paul Lewis, Denver, Colo., James Bopp, Jr. and Richard E. Coleson of Brames, McCormick, Bopp & Abel, Terre Haute, Ind., filed an amici curiae brief on behalf of Senator Gordon J. Humphrey and Congressmen Thomas J. Tauke, Thomas A. Luken, Thomas J. Bliley, Dan Coats, Chris-

topher H. Smith, Henry J. Hyde, Alan B. Mollohan, and Vin Weber in support of defendant-appellant.

John H. Hall and Mary Sue Henifin of Debevoise & Plimpton, New York City, of counsel: Nadine Taub, Rutgers University School of Law, Newark, N.J., and Sarah E. Burns, Legal Director, NOW Legal Defense and Educ. Fund, New York City, filed an amici curiae brief on behalf of NOW Legal Defense and Educ. Fund, National Abortion Rights Action League, American Ass'n of University Women, Black Women's Agenda, Catholics for a Free Choice, Center for Population Options, Colorado Women's Bar Ass'n, National Abortion Federation, National Council of Jewish Women, National Emergency Civil Liberties Committee, National Organization for Women, National Women's Conference Committee, National Women's Health Network, National Women's Political Caucus, Public Citizen Health Research Group, United Church of Christ, Women's Equity Action League, Women's Law Project, Young Women's Christian Ass'n of Boulder County, Young Women's Christian Ass'n of Metropolitan Denver, and Young Women's Christian Ass'n of U.S.A. in support of plaintiffs-appellees.

Jack R. Bierig, David F. Graham, Lynn D. Fleisher and Richard D. Raskin, Sidley & Austin, Chicago, Ill., of counsel: Kirk B. Johnson and Edward B. Hirshfeld, American Medical Ass'n, Chicago, Ill., Ann E. Allen, American College of Obstetricians and Gynecologists, Washington, D.C., filed an amici curiae brief on behalf of the American Medical Ass'n, American College of Obstetricians and Gynecologists, and American Society of Human Genetics in support of plaintiffs-appellees.

Bruce S. Wolff, Charles S. Sims, Suzette Brooks and William S. Koenig of Proskauer, Rose, Goetz & Mendelsohn, New York City, filed an amici curiae brief on behalf of The American Public Health Ass'n, The Ass'n of State and Territorial Health Officers, The Ass'n of Schools for Public Health, The American College of Physicians, The American Medical Student Ass'n, The Ass'n of Reproductive Health

Professionals, The California Coalition of Nurse Practitioners, The Colorado Academy of Family Physicians, The Colorado Dept. of Health, Colorado Physicians for Choice, Colorado/Wyoming Chapter of the American College of Nurse Midwives, The Intermountain Medical Society, The Maryland Dept. of Health and Mental Hygiene, The National Ass'n of Nurse Practitioners in Family Planning, The National Urban League, The Nurses Ass'n of the American College of Obstetricians and Gynecologists, The Ohio Dept. of Health, The South Dakota State Dept. of Health, The Wisconsin Nurse Practitioners in Reproductive Health, and Dr. Allan Rosenfield, Dean of the Columbia University School of Public Health in support of plaintiffs-appellees.

Cynthia P. Delaney, Leanne B. DeVos, Karen H. DuWaldt, Diana Terry Reindl, and Kathleen Yurchak, American Civil Liberties Union Found. of Colorado, Denver, Colo., filed an amicus curiae brief on behalf of American Civil Liberties Union in support of plaintiffs-appellees.

David M. Becker and Virginia A.S. Kling of Wilmer, Cutler & Pickering, Washington, D.C., filed an amici curiae brief on behalf of Representative Bill Green, Senators Barbara A. Mikulski, Lowell P. Weicker, Jr., Brock Adams, John H. Chafee, Alan Cranston, Howard M. Metzenbaum, Paul Simon, Robert T. Stafford, William S. Cohen, Daniel J. Evans, Bob Packwood, and Timothy E. Wirth, and Representatives Daniel K. Akaka, Les AuCoin, Julian C. Dixon, Vic Fazio, William H. Gray III, Steny H. Hoyer, William Lehman, Robert J. Mrazek, John Edward Porter, Martin Olav Sabo, Henry A. Waxman, Jim Bates, Rick Boucher, Cardiss Collins, Mickey Leland, James H. Scheuer, Ron Wyden, Gary L. Ackerman, Chester G. Atkins, Anthony C. Beilenson, Howard L. Berman, Sherwood L. Boehlert, Don Bonker, Barbara Boxer, George E. Brown, Jr., Albert G. Bustamante, Benjamin L. Cardin, Thomas R. Carper, George W. Crockett, Jr., Peter A. DeFazio, Ronald V. Dellums, Mervyn M. Dymally, Don Edwards, Lane Evans, Dante B. Fascell, Walter E. Fauntroy, Barney Frank, Bill Frenzel, Robert Garcia, Sam Gejdenson, Benjamin A. Gilman, Charles A.

Hayes, James M. Jeffords, Nancy L. Johnson, Robert W. Kastenmeier, Joseph P. Kennedy II, Peter H. Kostmayer, Richard H. Lehman, Sander M. Levin, Mel Levine, John Lewis, Mike Lowry, Matthew G. Martinez, Robert T. Matsui, George Miller, John R. Miller, Jim Moody, Constance A. Morella, Bruce A. Morrison, Stephen L. Neal, Nancy Pelosi, Claude Pepper, Charles B. Rangel, Marge Roukema, Claudine Schneider, Patricia Schroeder, Christopher Shays, David E. Skaggs, Louise M. Slaughter, Lawrence J. Smith, Olympia J. Snowe, Stephen J. Solarz, Pete Stark, Gerry E. Studds, Edolphus Towns, Morris K. Udall, Ted Weiss, Alan Wheat, and Howard Wolpe in support of plaintiffs-appellees.

Before LOGAN, MOORE and BALDOCK, Circuit Judges.

LOGAN, Circuit Judge.

This appeal arises out of an action brought by organizations and physicians receiving funds under Title X of the Public Health Service Act, 42 U.S.C. §§ 300 to 300a–6, who challenge, on behalf of themselves and their patients, the 1988 amendments to the regulations under which Title X funds are administered. *See* 53 Fed.Reg. 2922, 2943–46 (1988) *codified at* 42 C.F.R. §§ 59.2, 59.5, 59.7–59.10. The new regulations prohibit Title X participants from advising women about abortion as a medical option if birth control devices should fail or if they are already pregnant, and the regulations require physical, financial, and personnel separation of Title X supported facilities from any others that counsel about or perform abortions.

The district court entered a preliminary and then a permanent injunction against implementation of the new regulations. *Planned Parenthood Fed'n of Am. v. Bowen,* 680 F.Supp. 1465 (preliminary injunction) and 687 F.Supp. 540 (permanent injunction) (D.Colo.1988). The district court ruled that the regulations violate the intent of Congress as expressed in the statute, informed by its contemporaneous and subsequent legislative history. 680 F.Supp. at 1468–73; 687 F.Supp. at 542. It also held that the regulations violate the

constitutional rights of the women patients and their advising physicians. 680 F.Supp. at 1473–78; 687 F.Supp. at 542–44. On appeal the Secretary of Health and Human Services challenges all of these rulings.

Two other federal courts of appeals have faced the precise issues before us. A divided panel of the Second Circuit upheld the 1988 regulations against both statutory and constitutional challenges, *New York v. Sullivan,* 889 F.2d 401 (2d Cir.1989), *cert. granted,* —— U.S. ——, 110 S.Ct. 2559, 109 L.Ed.2d 742 (1990). The First Circuit, en banc with one dissent, struck down the new regulations in their entirety, principally on constitutional grounds. *Massachusetts v. Secretary of Health & Human Services,* 899 F.2d 53 (1st Cir.1990) (en banc). That court concluded that of the 1988 amendments, only 42 C.F.R. § 59.9 was invalid as inconsistent with Congress' intent as expressed in Title X or on other nonconstitutional grounds. But the court held that all of the amendments violated the constitutional rights of women to make informed decisions concerning abortion, and violated the consulting physicians' First Amendment rights to properly advise their patients.

We find ourselves in agreement with the First Circuit's analysis, and we join it in holding the regulations invalid.

I

Congress enacted Title X of the Public Health Service Act, 42 U.S.C. §§ 300 to 300a–6, in 1970. The act authorizes the Secretary of Health and Human Services "to make grants to and enter into contracts with public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services." *Id.* § 300(a). Section 1008 of that act provides that "[n]one of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning." *Id.* § 300a–6. Grants and contracts under Title X are to be made "in accordance with such regula-

tions as the Secretary may promulgate." *Id.* § 300a–4.

Title X funds have never been permitted to be used either to perform or to subsidize actual abortions. *See* 42 C.F.R. §§ 59.-5(a)(5), 59.9 (1986). Almost since its enactment, however, the administrative interpretations permitted, and, since 1981, required Title X projects to provide nondirective counseling and referrals to pregnant women about all legally available medical options, including abortion. 53 Fed.Reg. 2923 (1988) This policy was reversed abruptly in 1988 by the promulgation of the regulations now under attack.

In the new regulations, § 59.2 redefined the term "family planning" to refer solely to preconceptual services, explicitly excluding pregnancy care and abortion. Sections 59.7 and following were rewritten entirely. Section 59.8(a)(1) expressly prohibits Title X projects from providing counseling concerning abortion or referrals for abortion. Section 59.8(a)(2) states that once a Title X project client is diagnosed as pregnant she "must be referred for appropriate prenatal and/or social services" by giving her a list of providers that promote welfare of mothers and unborn children, and she "must also be provided with information necessary to protect the health of mother and unborn child until such time as the referral appointment is kept." She may be referred for emergency care. But § 59(a)(3) says that the project may not use emergency referrals as an "indirect means of encouraging or promoting abortion" by weighing referrals in favor of providers that perform abortions, by including on the list of referrals any providers whose principal business is providing abortions, by excluding providers who do not perform abortions, or by "steering" women to providers who offer abortions. Subsection (4) states that the project can provide the woman with medical information necessary to assess the risks of different methods of contraception, but cannot include counseling with respect to abortion.

Examples of proper and improper actions by Title X providers are set out in § 59.8(b). A pregnant woman requesting prenatal care must be referred to appropriate providers of prenatal care services. *Id.* § 59.8(b)(1). But a pregnant woman who directly asks for a list of abortion providers may not be given a list that includes any clinic which "principally" provides abortion, or a list that includes hospitals and clinics which provide abortion in addition to prenatal care, unless providers of prenatal care in the area that do not provide or refer for abortions are also included on the list. *Id.* § 59.8(b)(3) & (4). The Title X project is expressly prohibited from referring a pregnant woman to an abortion provider, even upon specific request, and apparently must tell one making such an inquiry that "the project does not consider abortion an appropriate method of family planning and therefore does not counsel or refer for abortion." *Id.* § 59.8(b)(5).

Section 59.9 states specifically that Title X projects have to be so organized that they are "physically and financially separate" from prohibited abortion activities. This requires that the Title X project must have an "objective integrity and independence from prohibited activities;" mere bookkeeping separation is not sufficient. *Id.* The objective integrity and independence is based on factors that include, but are not limited to, separate accounting records, separate facilities, separate personnel, and absence of material promoting abortion. *Id.*

Section 59.10(a) prohibits "actions to assist women to obtain abortions or increase the availability or accessibility of abortion." Specific examples of prohibited activities include lobbying for legislation increasing the availability of abortions, giving patients brochures advertising an abortion clinic, or making an appointment for a pregnant woman with an abortion clinic.

## II

Although the Secretary admits that the 1988 regulations are a result of a shift in political climate and represent a significant departure from the policy of the first seventeen years of Title X grants, *see New York*, 889 F.2d at 418 (Kearse, J., dissenting), he defends the regulations as

more consistent with the proper interpretation of Title X than the earlier practice. Thus, we determine first whether the 1988 changes in the regulations are permissible under the statute, apart from their constitutionality.

The words of the statute are paramount, of course, and we must give effect to the "unambiguously expressed intent of Congress." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). Each of the circuit courts that have considered the question have found the language of § 1008 of the Act, 42 U.S.C. § 300a–6, that no funds appropriated "shall be used in programs where abortion is a method of family planning," is not free from ambiguity. These courts then appropriately considered the contemporaneous and subsequent legislative history and past administrative interpretations of the section. *See Consumer Prods. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108–120, 100 S.Ct. 2051, 2056–2062, 64 L.Ed.2d 766 (1980). They found the contemporaneous legislative history ambiguous for the most part, although the First Circuit relied upon it to invalidate the new 42 C.F.R. § 59.9, requiring separation of facilities. *See Massachusetts*, 899 F.2d at 59–60. These decisions also considered the subsequent legislative history in the context of the long-standing administrative construction. In the end, however, both circuits, except for *Massachusetts'* ruling on § 59.9, held that the changes in the regulations were not beyond the power of the Secretary under the statute.

We agree that the language of 42 U.S.C. § 300a–6 is ambiguous in that it does not resolve the issues presented in the challenged regulations. Moreover, the contemporaneous legislative history does not address whether clinics receiving Title X funds can engage in nondirective counseling including the abortion option and referrals, upon patient request. While there has been some recent erosion of the federal courts' practice of consulting "longstanding and consistent" agency interpretations and some of the other techniques for parsing legislative history that we have used to ascertain whether a statute commands a particular result, the Supreme Court decisions have continued to rely on the "traditional tools of statutory construction" in determining congressional intent on "the precise question at issue," *Chevron*, 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9; *see NLRB v. United Food & Commercial Workers*, 484 U.S. 112, 123, 108 S.Ct. 413, 420, 98 L.Ed.2d 429 (1987); *INS v. Cardozo–Fonseca*, 480 U.S. 421, 446, 107 S.Ct. 1207, 1220, 94 L.Ed.2d 434 (1987). We have considered all of those traditional tools, but do not discuss them in any detail because we can add little to the *Massachusetts* court's analysis of the statute and the relevant interpretative history.

Like the *Massachusetts* court, we find that the propriety of the regulatory changes is a close question—largely because of many years of consistent administrative interpretation, with six reenactments of parts of Title X, and numerous reappropriations, during which unsuccessful attempts were made at statutory amendment to change the practice of counseling and referrals for abortion on this highly visible and controversial matter. *See Bob Jones University v. United States*, 461 U.S. 574, 599–602, 103 S.Ct. 2017, 2032–2034, 76 L.Ed.2d 157 (1983) (agency interpretation of statute confirmed or ratified by subsequent congressional failure to change it). In the end, however, we agree with the *Massachusetts* court that, except for new 42 C.F.R. § 59.9, the amendments are not statutorily impermissible.

Title X clearly directs the Secretary to administer a grant program to promote family planning under a statute that delegates to him some discretion with an admonition not to fund abortions. Supreme Court decisions have held that when the mandate of Congress is ambiguous we must defer to any reasonable interpretation by the agency. *See, e.g., NLRB v. Curtin Matheson Scientific, Inc.*, —— U.S. ——, ——, 110 S.Ct. 1542, 1549, 108 L.Ed.2d 801 (1990); *United Food & Commercial Workers Union*, 484 U.S. at 123, 108 S.Ct. at 420; *Chevron*, 467 U.S. at 844, 104 S.Ct. at

2782. This rule applies even when the agency is changing a prior interpretation. *E.g., Curtin Matheson,* — U.S. at ——, 110 S.Ct. at 1549; *Chevron,* 467 U.S. at 864–64, 104 S.Ct. at 2792; *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983); *American Trucking Ass'ns, Inc. v. Atchison, Topeka & S.F. Ry. Co.,* 387 U.S. 397, 416, 87 S.Ct. 1608, 1618, 18 L.Ed.2d 847 (1967). That the interpretation is long-standing is not significant unless we can comfortably conclude that a majority of Congress intended the prior interpretation to be frozen into law, a conclusion we cannot reach here. *See Motor Vehicle Mfrs.,* 463 U.S. at 45, 103 S.Ct. at 2867.

The Secretary must justify his change of interpretation with "a reasoned analysis," *Motor Vehicle Mfrs.,* 463 U.S. at 42, 57, 103 S.Ct. at 2866, 2874. In a lengthy discussion in the Federal Register, the Secretary argued that the new regulations are more in keeping with the original intent of the statute, justified by client experience under the prior policy, supported by a shift in attitude against "elimination of unborn children by abortion," 53 Fed.Reg. at 2944, and consistent with a change in policies by a new political administration. Whether or not we personally would approve of these changes, the agency has sufficiently justified them and we therefore cannot rule them to be arbitrary and capricious. *See Chevron,* 467 U.S. at 865, 104 S.Ct. at 2792.

The one exception is 42 C.F.R. § 59.9, which requires an amount of physical, financial, and personnel separation between Title X funded activities and any counseling mentioning abortion that would seem to put out of business many current grantees. All of the Title X grantees must provide at least ten percent nonfederal "matching funds," 42 U.S.C. § 300a–4(a). Most provide significantly more than that; federal funds apparently account for only about fifty percent of the money received by Title X grantees. *Massachusetts,* 899 F.2d at 56. One of the plaintiffs in the case before us is a physician in private practice who handles Title X patients in his office, I R. tab 1 ¶ 10; that doctor performs abortions

for private, paying patients, *id.* tab 2, Decl. Sylvia Clark. The new § 59.9 clearly prohibits continued Title X funding to that doctor, despite the fact that he is not providing abortion services for Title X patients. Quite apart from the constitutional problems, we agree with the *Massachusetts* court, 899 F.2d at 59–60, and the district court below, 680 F.Supp. at 1468–69, that new § 59.9 has the effect of restricting the number of permissible grantees beyond the intent of Congress as expressed in 42 U.S.C. §§ 300, 300a and Title X as a whole. Although it was not enacted as a part of Title X, 42 U.S.C. § 300a–7 lends support to our holding. This provision had its origin as a measure to prevent discrimination against those who will not perform abortions, but clearly states a general nondiscrimination policy applicable to all grants under the Public Health Service Act, of which Title X is a part. That section requires that no personnel decisions be made on the basis of either "reluctance or willingness" to counsel or perform abortions. *Id.* § 300a–7(d). When the antidiscriminatory provisions are considered along with the statements in Title X of an intent to provide a "broad range" of services, 42 U.S.C. § 300(a), taking into account the extent "services are needed locally," *id.* § 300(b), that "priority will be given ... to furnishing such services to persons from low-income families," *id.* § 300a–4(c)(1), with suitable "informational or educational materials" made available to the targeted population, *id.* § 300a–4(d)(1), we believe it violates congressional intent to deny the issuance of Title X grants solely because the grantee is not sufficiently funded to meet the separation requirements of 42 C.F.R. § 59.9.

### III

█ We turn now to the constitutional issues raised by plaintiffs and passed upon by the district court. The important threshold question is whether the instant situation is controlled by the line of cases commencing with *Maher v. Roe,* 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), which hold that a government constitution-

ally may encourage childbirth over abortion by funding only prenatal and childbirth expenses. The Court found that the carrot of state aid, which might induce an indigent woman to carry to term rather than abort, was not the equivalent of a state-created obstacle in the woman's path to an abortion. *Id.* at 474, 477 n. 10, 97 S.Ct. at 2382, 2384 n. 10.

In *Harris v. McRae,* 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), the Court held that the United States government's refusal to fund an indigent woman's medically necessary abortion, when it would pay the costs of her bearing the child, did not violate her constitutional rights. The Court reasoned that her freedom of choice does not carry with it a constitutional entitlement to the money necessary to avail herself of the full range of protected choices; "although government may not place obstacles in the path of a woman's exercise of her freedom of choice, it need not remove those not of its own creation." *Id.* at 316, 100 S.Ct. at 2687. A year ago, the Supreme Court upheld, on the same reasoning, the right of a state to prohibit the use of state funds or state facilities to perform abortions; "Missouri's refusal to allow public employees to perform abortions in public hospitals leaves a pregnant woman with the same choices as if the State had chosen not to operate any public hospitals at all. The challenged provisions only restrict a woman's ability to obtain an abortion to the extent she chooses to use a physician affiliated with a public hospital." *Webster v. Reproductive Health Services,* — U.S. ——, 109 S.Ct. 3040, 3052, 106 L.Ed.2d 410 (1989).

Although the instant case bears superficial resemblance to the *Maher* line of decisions—a governmental choice to use its funds to promote childbirth over abortion—there are significant differences which we believe make those cases inapposite. The government, of course, has not gone so far as to socialize medicine and publicly fund all hospitals and physicians, a situation the *Webster* decision said might require a different analysis. 109 S.Ct. at 3052 n. 8.[1] But it has set up a funding system by which approximately 4,000 entities, including state governments, have been induced to become Title X grantees by offers of up to ninety percent federal funding. The Secretary has admitted that the projects serve approximately 1,000,000 adolescent women. 53 Fed.Reg. at 2944. The total number of women served is no doubt much greater.

> "It has been said that Title X, as the single largest federally-funded family planning program, serves 4.3 million people: its targeted population consists of an estimated 14.5 million women at risk of unintended pregnancy, including 5 million adolescents between the ages of 15 and 19, and 9.5 million adult women between the ages of 20 and 44, all of whom have an income 150 percent below the poverty level."

*New York,* 889 F.2d at 415 n. 1.

The record establishes that many women who visit these Title X providers do so because they suspect they are pregnant; the clinic provides pregnancy testing, and many are indeed found to be pregnant. Had the regulations directed that once pregnancy is established the clinic must say, "Go away, we only give advice on prepregnancy planning," then it might be said the government has done no more than subsidize a permissible activity. The regulations, however, require the clinic to go one step further in its treatment of the

---

1. *Webster* also expressed reservation regarding the constitutionality of a state's denying use of public facilities to doctors who perform abortions for private patients at private facilities. 109 S.Ct. at 3052 n. 8. Such a situation is analogous to the regulations before us now, because the regulations deny public funding to grantees who perform or counsel concerning abortions, even for private, non-publicly funded patients. *See* 53 Fed.Reg. 2922 ("[S]ection 1008 [42 U.S.C. § 300a–6] ] extends to all activities conducted by the federally funded project, not just the use of federal funds for abortions within the project."); 53 Fed.Reg. 2927 ("The Department's concern is that all funds allocated to the Title X program or project—whether they are direct Title X grant funds, program or grant-related income, or matching [private] fund [sic]— be spent in compliance with Section 1008 and that the program be separate and distinct from prohibited abortion activities.").

patient. When a patient is diagnosed as pregnant she *must* be provided with both referrals to prenatal service providers and with interim information on prenatal care. 42 C.F.R. § 59.8(a)(2). Even if the patient specifically requests information on abortion, the clinic is not permitted to advise her about it. We can summarize this no better than did Judge Kearse in her dissent in *New York:*

> "There can be no doubt that the Secretary intends this regulation to forbid a grantee from informing a pregnant woman of the availability of abortion and even from telling her where she can get abortion-related information. For example, though the regulations permit a grantee to give the woman a list of prenatal-care service providers that might also offer abortions, the list must comply with several requirements. It *must* include any available prenatal-care providers that *do not* perform abortions; it *cannot* include providers that offer abortions as their 'principal business'; and it cannot 'weigh[ ]' in favor of abortion providers. 42 C.F.R. § 59.8(a)(3). The grantee is not allowed to inform the woman which providers on the list, in addition to offering prenatal care, also perform abortions. Rather, care providers that also perform abortions may be included only if *'the referral* is *specifically* made to the providers of *prenatal* care services.' 53 Fed.Reg. 2922, 2938 (1988). Indeed, the grantee is required to inform the client about care to preserve the unborn fetus. Section 59.8(a)(2), for example, provides that 'once a client served by a Title X project is diagnosed as pregnant, she must be referred for appropriate prenatal and/or social services *by furnishing a list of available providers that promote the welfare of mother and unborn child.'*
>
> ... In addition to the regulations discussed above, for example, § 59.8(b)(4) provides that when a woman asks for a list of abortion providers, the grantee is not permitted to give her a list that includes entities whose principal business is abortion, or a list that does not include 'providers of prenatal care in the area which *do not* provide or refer for abortions.' In contrast, § 59.8(b)(5) provides that when a woman asks for information on abortion, the grantee is permitted to 'tell[ ] her that the project does not consider abortion an appropriate method of family planning and therefore does not counsel or refer for abortion'; it is permitted to 'tell[ ] the client that the project can help her to obtain prenatal care and necessary social services, and provide[ ] her with a list of such providers from which the client may choose.'
>
> Thus, the express prescriptions and proscriptions in the regulations require the grantee to emphasize prenatal care and prohibit it from identifying any entity as a provider of abortions. Plainly, the regulations facially discriminate on the basis of viewpoint and control the content of the grantee's permitted speech."

889 F.2d at 415–16 (emphasis in original).

If we could conclude that the pregnant women who are patients of Title X clinics are knowledgeable about their abortion option, or will seek advice from doctors not fettered by the Title X regulations, then we might conclude that *Maher* controls, because poverty alone does not give a woman the right to government-funded benefits. But it seems clear that government funding, which fuels virtually all "birth control" clinics in the nation, lures poverty-level women to these clinics for pregnancy testing, medical advice, and referrals to other health care providers. The promise of the clinics, and their goal under law, is to provide "comprehensive voluntary family planning services" upon request. H.R.Rep. No. 1472, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.Code Cong. & Admin.News 5068, 5075. Fees for the services are determined on a sliding scale, based on the woman's income. Absent a warning that the advice given at Title X clinics is incomplete, many patients no doubt will rely, without obtaining a second opinion, on the advice given them. At least many of the poorest, most naive and ignorant women—who are the persons targeted by Title X—will rely on

that information.[2] Thus, by denying Title X providers the right to mention abortion, to refer to abortion as an option, or to provide professional referrals to others whom they know will counsel about all medical options that are legal, including abortion, the government has placed a state-created "obstacle in the path of a woman's exercise of her freedom of choice." *Harris,* 448 U.S. at 316, 100 S.Ct. at 2688.[3]

We must examine whether that obstacle, the government's provision of intentionally incomplete information, violates any constitutional right previously recognized by the Supreme Court. Of course, under current law a pregnant woman in the first stages of pregnancy has a federal constitutional right to an abortion. *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Even if *Roe* is overruled, it means only that the existence of the right to an abortion is left to the political process, probably to the states. No doubt some states would continue to permit abortions, and a pregnant woman in a state forbidding abortions, by virtue of her right of travel to another state, in theory at least still would be able to secure a legal abortion. Thus abortion is currently a legally permissible option for a woman in the early stages of pregnancy, and it will likely remain so.

Because patients at a Title X clinic are invited to consult its physicians and are given intentionally incomplete medical advice, which they reasonably can be expected to follow, we think this case falls squarely within the prohibition in *Thornburgh v. American College of Obstetricians and Gynecologists,* 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986), and *City of Akron v. Akron Center for Reproductive Health, Inc.,* 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983), against state intrusion into the advice a woman requests from or is given by her doctor. However *Webster, Hodgson v. Minnesota,* —— U.S. ——, 110 S.Ct. 2926, 111 L.Ed.2d 344 (1990), and *Ohio v. Akron Center for Reproductive Health,* —— U.S. ——, 110 S.Ct. 2972, 111 L.Ed.2d 405 (1990), may have affected aspects of the *Thornburgh* and *Akron* decisions, we see nothing to diminish *Akron's* holding that

> "because abortion is a medical procedure, ... the full vindication of the woman's fundamental right necessarily requires that her physician be given 'the room he needs to make his best medical judgment.' The physician's exercise of this

**2.** Of course, the Secretary is in fact anticipating that women will rely on the information provided and will not therefore either need or desire abortions. *See* 42 C.F.R. § 59.2 ("[A]bortion may not be included as a method of family planning in the Title X project. Family planning, as supported under this subpart, should reduce the incidence of abortion."); 42 C.F.R. § 59.8(b)(5) (example of pregnant woman who requests information on abortion providers and is given only prenatal care referrals). Information and referrals are an integral part of the services envisioned in the regulations. 53 Fed. Reg. 2923.

**3.** We will not assume, as the government apparently does, Appellant's Brief at 44 n. 38, that the effect of the Title X provider's failure to mention abortion is mitigated or eliminated by a woman's access to abortion information from other sources. In fact, a provider's failure to mention abortion as a legal option, in the context of an otherwise neutral medical consultation, could well cause the woman to conclude that abortion is not a legal or medical option for her under the circumstances. Many states have recently undertaken measures to modify their

abortion laws, which efforts receive extensive media attention. *See* "States Testing the Limits on Abortion," *N.Y. Times,* April 2, 1990, at A14, col. 4 (citing 100 then-pending abortion bills; fourteen floor votes on abortion bills since *Webster*). One reason women might seek information about their medical options at a family planning clinic is the confusion that arises from the barrage of bills introduced, passed, vetoed, or stayed by judicial action. *See, e.g., id.* (Guam, Pennsylvania, and South Carolina laws restricting access to abortion stayed in court actions; Idaho bill restricting abortion passed by legislature but vetoed by governor); "Maryland Legislature Halts an Abortion Move," *id.,* March 24, 1990, at A7, col. 1 (Maryland legislature rejects public referendum to decide which of two conflicting abortion bills becomes law). The two decisions issued at the end of the most recent Supreme Court term, *Hodgson v. Minnesota,* —— U.S. ——, 110 S.Ct. 2926, 111 L.Ed.2d 344 (1990), and *Ohio v. Akron Center for Reproductive Health,* —— U.S. ——, 110 S.Ct. 2972, 111 L.Ed.2d 405 (1990) (upholding parental notification statutes), are unlikely to reduce the legislative activity or women's confusion about their medical options.

medical judgment encompasses both assisting the woman in the decisionmaking process and implementing this decision should she choose abortion."

462 U.S. at 427, 103 S.Ct. at 2491 (citations omitted).[4] Stating that "it remains primarily the responsibility of the physician that appropriate information is conveyed to his patient," the Court struck down government-imposed abortion regulations "designed to influence the woman's informed choice between abortion or childbirth." *Id.* at 443–44, 103 S.Ct. at 2499–2500. "The State's intent is in ensuring that the woman's consent is informed and unpressured; the critical factor is whether she obtains the necessary information and counseling from a qualified person." *Id.* at 448, 103 S.Ct. at 2502.

These principles were reaffirmed in *Thornburgh,* 476 U.S. at 760, 762, 106 S.Ct. at 2178, 2179. Indeed, *Thornburgh* condemned state rules that structured and slanted the dialogue between the physician and the pregnant patient in language that seems precisely applicable to the situation at bar:

"Forcing the physician or counselor to present the materials [discouraging abortion] and the list [including agencies offering alternatives to abortion] to the woman makes him or her in effect an agent of the State in treating the woman and places his or her imprimatur upon both the materials and the list. All this is, or comes close to being, state medicine imposed upon the woman, not the professional medical guidance she seeks, and it officially structures—as it obviously was intended to do—the dialogue between the woman and her physician."

476 U.S. at 763, 106 S.Ct. at 2180 (citation omitted).

Again, we cannot improve upon the following statement in Judge Kearse's dissent in *New York* concerning the effect on the woman's constitutional rights:

"The regulations at issue here prohibit the physician in a Title X facility from communicating to his patient frank and complete advice if it involves consideration of abortion. They require him, in referring his patient to other health-care providers, to identify only prenatal-care facilities. If his pregnant patient raises the subject of abortion, he is required to tell her that he cannot give her any advice or counseling on the subject. If she asks where she can get information, the regulations prohibit even an informative response.

. . . . .

Unlike the regulatory schemes in such cases as *Harris* ... and *Maher* ... in which the regulating authority was found merely to have refused to extend an affirmative benefit to women who freely chose abortion, but not to have placed obstacles in the way of an informed choice, the Secretary's regulations here plainly interfere with the pregnant woman's freedom to decide which course of action she prefers. In some cases, the information ban will delay the appropriate education of the patient to such an extent that she is denied any genuine choice. In some cases, the patient will never be fully informed, for as the Secretary has acknowledged, '[f]or many clients, family planning programs are their only continuing source of health information and medical care.' U.S. Dep't of Health and Human Services, *Program Guidelines for Project Grants for Family Planning Services* § 9.4 (1981). These regulations prevent such a program from giving the client any substantive information regarding abortion as an option; if she asks where she may obtain such information, her Title X physician is prohibited from telling her.

By prohibiting the delivery of abortion information and prohibiting communication even as to where such information can be obtained, the present regulations deny a woman her constitutionally pro-

---

**4.** The Supreme Court's recent *Ohio* opinion, while approving a state requirement that a physician inform one parent when a minor patient is considering abortion, continues to recognize the importance of the advice of a detached physician with full information. *Ohio,* 110 S.Ct. at 2983.

tected right to choose. She cannot make an informed choice between two options when she cannot obtain information as to one of them."

889 F.2d 416–17.

Although the matter has received little separate attention in court opinions to this point, the limitations placed on Title X physicians in communicating with their patients, and the referral obligations imposed upon them, violate the constitutional rights of the physicians themselves. The dearth of attention may be because the physicians' rights are considered derivative from the rights of the patient. *See Whalen v. Roe,* 429 U.S. 589, 604 n. 33, 97 S.Ct. 869, 879 n. 33, 51 L.Ed.2d 64 (1977); *Harris,* 448 U.S. at 318 n. 21, 100 S.Ct. at 2689 n. 21. In the context of a right to advice in the confidential physician-patient relationship, physicians' rights would seem to be entirely coextensive with those of their patients, and if the patient's constitutional rights are violated so are the physician's. Nevertheless, a separate discussion of the physicians' position illuminates their predicament under the 1988 regulations and strengthens our belief that the new regulations must fail.

Physicians, of course, need not accept employment with grantees of Title X funds if they do not wish to abide by the limitations upon the advice they may give patients; presumably physicians already working for such organizations may quit if they do not like the regulations, although breaking contracts of employment might render them liable for damages. Even so, it is a well-established principle that, although the government has no responsibility to provide funds for a program, it may not condition participation in a program it

does fund upon a waiver of constitutional rights. This is set forth clearly in *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972), as follows:

"For at least a quarter-century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech."

This principle applies fully to employment situations. Individuals may not be required to abandon their constitutional rights to free speech or due process to obtain employment. *Id.* at 597, 92 S.Ct. at 2697.

The canons of ethics of the medical profession require physicians to give patients advice that includes abortion as an alternative to carrying a pregnancy to term when the patient's health condition warrants.[5] The health hazards of abortion in a particular instance may be less than the health hazards of carrying the pregnancy to term. One study comparing mortality statistics from abortion and childbirth concluded that "[i]n terms of dying, abortion through the 15th week of pregnancy is at least tenfold safer than childbearing." Cates, Smith, Rochat & Grimes, *Mortality from Abortion and Childbirth,* 248 J.Am.Med.A. 192, 196 (July 9, 1982).

The amended regulations, particularly 42 C.F.R. §§ 59.8(a)(1) & (4) and 59.10(a), appear to prohibit physicians paid with Title

---

**5.** The American Medical Association Standards regarding informed consent state that physicians may refer patients to "any other provider of health care services permitted by law to furnish such services, whenever he believes that this may benefit the patient." *Current Opin. of Council on Ethical & Judicial Affairs of the American Medical Association—1986,* ¶ 304; *see also id.* ¶ 807 ("physician has an ethical obligation to help the patient make choices from among the therapeutic alternatives consistent with good medical practice"); American College

of Obstetricians & Gynecologists (ACOG), *Standards for Obstetric–Gynecologic Services* 57 (1985) (in event of unwanted pregnancy the physician should counsel patient of abortion option); ACOG, *Statement of Policy: Further Ethical Considerations in Induced Abortion* (Dec. 1977) ("Counseling directed solely toward either promoting or preventing abortion does not sufficiently reflect the full nature of the problem or the range of options to which the patient is entitled.").

X funds from advising women about the alternative of abortion even when carrying the baby to full term would involve grave risks for the mother. The regulations, particularly § 59.8(a)(2), appear to require Title X physicians to provide pregnant patients with literature from health care providers who will not perform abortions or counsel abortion as an option, and to forbid those physicians from referring pregnant patients to health care providers who will provide such services. In complying with the regulations, in theory at least, the physician risks censure and loss of his right to practice because of his failure to give impartial and full advice.

To condition receipt of Title X funds upon physicians' promises not to give advice that the standards of their profession require them to give implicates the physicians' First and Fifth Amendment rights. *See, e.g., Thornburgh,* 476 U.S. at 763, 106 S.Ct. at 2180; *Akron,* 462 U.S. at 445, 103 S.Ct. at 2500; *Frieman v. Ashcroft,* 584 F.2d 247, 251–52 (8th Cir.1978); *aff'd mem.,* 440 U.S. 941, 99 S.Ct. 1416, 59 L.Ed.2d 630 (1979). This conclusion also does not depend on the continued efficacy of *Roe v. Wade* because, for the reasons already stated, for most women abortion would continue to be a legal alternative that physicians must be free to discuss with their patients.

For the reasons stated, we hold that the regulations violate the Title X providers' and women patients' First and Fifth Amendment rights. We AFFIRM the permanent injunction issued against the implementation of the challenged amendments to the regulations.

BALDOCK, Circuit Judge, dissenting in part.

With the apparent exception of the separation requirements contained in 42 C.F.R. § 59.9,[1] the court today holds unconstitutional the 1988 amendments to the HHS regulations, 42 C.F.R. §§ 59.1–59.17, designed to implement the purpose of Section 1008 of Title X of the Public Health Services Act, 42 U.S.C. § 300a–6. According to the court, the limitations placed upon Title X recipients by the regulations, namely § 59.8, facially violate a pregnant woman's fifth amendment right to choose abortion and her physician's first amendment right to speak frankly about abortion. Because Supreme Court precedent dictates a contrary result, I dissent.

### I.

The court reasons that *Thornburgh v. American College of Obstetricians and Gynecologists,* 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986), and *City of Akron v. Akron Center for Reproductive Health,* 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983), control the outcome of this case. Court's Opinion at 1501–02. In those cases, however, the Supreme Court struck down "informed consent" laws that required *all* doctors within their respective jurisdictions to provide *all* pregnant patients contemplating abortion with a litany of information, regardless of whether the patient sought the information or her doctor thought the information necessary to the patient's decision to abort. *Thornburgh* and *Akron* had nothing to do with a governmental decision to encourage child-

---

1. In part II of its opinion, the court holds § 59.9 invalid as contrary to Congressional intent. Court's Opinion at 1496–98. I agree. The aim of Title X is to increase and improve family planning services to indigents in cooperation with existing state and private programs. In enacting Title X, Congress did not intend "to restrict the types of projects with which a Title X recipient could associate, or to place limitations on the physical proximity or the sharing of personnel between Title X projects and unrelated programs which may provide abortion services." *Commonwealth of Mass. v. Bowen,* 679 F.Supp. 137, 143 (D.Mass.1988), *aff'd,* 899 F.2d 53 (1st Cir.1990), *cert. pending,* No. 89–

1929 (June 8, 1990). Because I concur fully in the court's statutory resolution of the challenged regulations, neither I nor the court have occasion to address § 59.9's constitutionality. *See Harris v. McRae,* 448 U.S. 297, 306–07, 100 S.Ct. 2671, 2682–2683, 65 L.Ed.2d 784 (1980) (where case may be decided on either statutory or constitutional basis, court should decide case on statutory basis and avoid constitutional adjudication). Since the court, however, assumes the severability of § 59.9 from the remaining regulations, the constitutionality of those regulations is at issue. *See Buckley v. Valeo,* 424 U.S. 1, 108, 96 S.Ct. 612, 677, 46 L.Ed.2d 659 (1976) (statutory severability).

birth and discourage abortion through the funding of services relating to the former and not the latter.

The possibility that the HHS regulations will discourage some women from having an abortion is hardly sufficient to invalidate those regulations on their face.[2] *See Thornburgh,* 476 U.S. at 829, 106 S.Ct. at 2214 (O'Connor, J., dissenting). *Webster v. Reproductive Health Servs.,* — U.S. —, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989), *Harris v. McRae,* 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), and *Maher v. Roe,* 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), all support the view that the allocation of government monies to encourage childbirth over abortion does not unduly burden a woman's right to seek an abortion or place a governmental obstacle in the path of a woman choosing to have an abortion. Yet this court rejects this line of decisions as bearing only a "superficial resemblance" to the instant case. Court's Opinion at 1499.

*Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), imposes *"no* limitation on the authority of a State to make a value judgment favoring childbirth over abortion, and to implement that judgment by the allocation of public funds." *Maher,* 432 U.S. at 474, 97 S.Ct. at 2382 (emphasis added). Section 59.8's restrictions on abortion counseling and referrals for Title X recipients leaves a pregnant woman with essentially the same choice as if the government had chosen not to provide Title X grants at all. Admittedly, this analysis might differ if the government had socialized medicine, *see Webster,* 109 S.Ct. at 3052 n. 8, but the government has not. At this point, the regulations interfere with a woman's ability to obtain an abortion only if she seeks an abortion with the assistance of Title X funds. *See id.* at 3052. The inability of an indigent woman to obtain an abortion would be no less in the absence of Title X. *See Harris,* 448 U.S. at 316, 100 S.Ct. at 2687. Accordingly, the HHS regulations do not infringe upon a woman's right to abortion.

## II.

The regulations, however, undoubtedly infringe upon the doctor-patient relationship by limiting the free flow of information from the doctor to the patient regarding abortion services. As Judge Cardamone stated: "[A] Title X physician's hands are tied with respect to the response he or she may give to a patient seeking abortion information.... [The regulations] constitute[ ] a trap for the mostly unsophisticated and unwary patients, and jeopardizes the ability of Title X physicians to safeguard the health of those people seeking their expert advice." *State of New York v. Sullivan,* 889 F.2d 401, 415 (2d Cir.1989) (Cardomone, J., concurring), *cert. granted,* — U.S. —, 110 S.Ct. 2559, 109 L.Ed.2d 742 (1990).

A physician certainly has a common law duty to discuss matters openly and frankly with the patient. *See Smith v. Cote,* 128 N.H. 231, 513 A.2d 341, 355 (1986) (Souter, J., concurring) (physician's timely disclosure of professional limits based on moral scruples combined with timely referral to physician not so constrained may be sufficient defense in action for failure to advise). Yet the Constitution provides little protection for the "dialogue" a physician undertakes in the course of treating a patient. *Thornburgh,* 476 U.S. at 802, 106 S.Ct. at 2200 (White, J., dissenting). Regulation of the professions is a matter within the competence of lawmakers, not federal courts. *Id.* at 802–803, 106 S.Ct. at 2200–2201 (Constitution is "largely unconcerned" with substantive aspect of professional regulation). Because the HHS regulations are rationally related to the governmental interest in "protecting potential life," they in no way infringe upon a physician's constitutional rights. *See Akron,* 462 U.S. at 466, 103 S.Ct. at 2511 (O'Connor, J., dissenting).

The first amendment does not require the government to subsidize the spread of information which as a matter of public policy the government finds repugnant.

---

**2.** A facial challenge to the regulations is a most difficult challenge since the challenger must establish that the regulations would be invalid under all circumstances. That the regulations might operate unconstitutionally under some scenario is insufficient to render the regulations invalid on their face. *Webster v. Reproductive Health Servs.,* — U.S.—, 109 S.Ct. 3040, 3060, 106 L.Ed.2d 410 (1990) (O'Connor, J., concurring).

*Regan v. Taxation with Representation,* 461 U.S. 540, 546, 103 S.Ct. 1997, 2001, 76 L.Ed.2d 129 (1983). *Perry v. Sinderman,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), cited by the court to support its holding that the regulations violate a physician's first amendment rights, is not to the contrary. Court's Opinion at 1503. In *Perry,* a state supported employer refused to extend the contract of its employee because the employee had exercised his first amendment rights outside the scope of his employment. Nothing in Title X prohibits recipients from saying about abortion whatever they desire outside of Title X services. *State of New York,* 889 F.2d at 412–13. Moreover, in *Perry,* the employer's purpose in suppressing the speech was *not* to avoid subsidizing the speech, but rather to punish the employee for political activity. *See FCC v. League of Women Voters,* 468 U.S. 364, 402, 408, 104 S.Ct. 3106, 3129, 3132, 82 L.Ed.2d 278 (1984) (Rehnquist, J., dissenting).[3] Unlike this case, the state action in *Perry* was unrelated to any legitimate governmental objective. Through the HHS regulations, the government in this instance merely has chosen to encourage childbirth rather than abortion. That policy choice in no way contravenes the Constitution.[4]

---

**3.** In *League of Women Voters,* the Court by a five to four vote held unconstitutional a congressional ban on editorializing by noncommercial educational television and radio stations where federal funding constituted only 1% of the stations' overall income. In contrast, federal funds account for 50% of the monies received by Title X recipients. Court's Opinion at 1498.

**4.** In *United Pub. Workers v. Mitchell,* 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947) and *Oklahoma v. United States Civil Serv. Comm'n,* 330 U.S. 127, 67 S.Ct. 544, 91 L.Ed. 794 (1947), the Supreme Court rejected the notion that Section 12(a) of the Hatch Act was unconstitutional because of its interference with an employee's freedom of expression in political matters. In his dissent in *League of Women Voters,* Justice Rehnquist cogently noted:

Section 12(a) of the Hatch Act totally prohibits any local or state employee who is em-

ployed in any activity which receives partial or total financing from the United States from taking part in any political activity. One might just as readily denounce such congressional action as prohibiting employees of a state or local government receiving even a minor fraction of that government's income from federal assistance from exercising their First Amendment right to speak.

468 U.S. at 406, 104 S.Ct. at 3131 (Rehnquist, J., dissenting). Of course, political association constitutes the "core of those activities protected by the first amendment." *Elrod v. Burns,* 427 U.S. 347, 356, 96 S.Ct. 2673, 2681, 49 L.Ed.2d 547 (1976). But the first amendment does not prohibit government from regulating the public political activity of those even partially dependent on its monetary benefits. How then, can the first amendment be read to prohibit a restriction on the dialogue between a physician and patient, when the physician and patient rely on federal funding to carry on such dialogue?